[L.A. No. 31649. May 26, 1983.]

In re the Marriage of MARILYN and ZELIG MODNICK.
MARILYN MODNICK, Appellant, v.
ZELIG MODNICK, Respondent.

898

COUNSEL

Esther Kascle for Appellant.

Stephen A. Kolodny and Max A. Goodman for Respondent.

OPINION

**BIRD C. J.**—In a marital dissolution proceeding, does the failure of one spouse to disclose the existence of a community property asset constitute extrinsic fraud?

I.

After 22 years of marriage, Marilyn and Zelig Modnick separated in September of 1974.[1] The next month, Marilyn petitioned the superior court for a dissolution of the marriage, alleging irreconcilable differences between the parties.

A trial began on September 18, 1975, and, after several continuances, concluded on April 26, 1976. Zelig testified that he had no bank accounts other than one checking account with a $7 balance. His financial declaration also did not reveal the existence of any other accounts.[2]

At the end of the trial, the court ordered the marriage dissolved, awarded Marilyn spousal support, and divided the community property in accordance with the stipulation of the parties. An interlocutory judgment of dissolution was filed on December 21, 1976. Both Marilyn and Zelig approved the form and content of the judgment.

In August of 1978, the Modnicks received notice that the Internal Revenue Service (IRS) was investigating their tax liability for the years 1974 through 1978. The IRS investigation concerned unreported income earned by Zelig and deposited in various bank accounts. At least one of these accounts—a savings account opened on September 24, 1970—contained sums earned by Zelig prior to the dissolution of the marriage. In 1975, Zelig had deposited approximately $15,000 of his income into this account. Zelig had not disclosed the existence

---

[1] In January of 1973, Marilyn suffered a severe nervous breakdown. She has been under psychiatric care for chronic depression ever since.

[2] The declaration indicated that Zelig had a net monthly income of $1,153.79 and made monthly contributions to a credit union at his place of employment.

of this community property to Marilyn or the court during the dissolution proceedings.[3]

Marilyn alleges that at first she "did not know or understand the details about" the IRS investigation. Subsequently, through her counsel, she filed a motion to set aside the interlocutory judgment on the ground of fraud. The motion was heard by the trial court on June 6, 1979, and denied "without prejudice to being set for hearing on after-discovered community property issues." Another hearing was set for July 16, 1979.

In a declaration, Marilyn alleges that prior to the next hearing date, Zelig told her that further court proceedings would be unnecessary to resolve the property dispute. He said that if she contacted his attorney, a fair settlement of the concealed assets would be arranged. Relying on this advice, Marilyn substituted herself as counsel of record and began to negotiate with Zelig's attorney. On July 16th, neither party appeared for the scheduled hearing and Marilyn's motion to set aside the interlocutory judgment was ordered off calendar.

At Zelig's request, the trial court entered a final judgment of dissolution on August 6, 1979. This decree made all the provisions of the interlocutory judgment binding and restored the parties to the status of unmarried persons. When Marilyn received notice of the final judgment, she ignored it, for she believed that Zelig still intended to divide the concealed community property with her.

However, her attempts to settle the dispute with Zelig and his attorney ultimately failed. At this point, Marilyn sought the assistance of counsel. Attorney Morris Weide briefly represented her in late 1979. In January of 1980, Marilyn's present counsel, Esther Kascle, became involved in the case. She engaged in another six months of unsuccessful negotiations with Zelig's attorney.

Finally, through her counsel, Marilyn filed a second motion to set aside the interlocutory and final judgments on the ground of fraud. She also claimed, as a separate basis for vacating the divorce decree, that she and Zelig had reconciled from September of 1975 to September of 1978.[4] Supporting and opposing declarations were filed by the parties. Zelig argued, inter alia, that the doctrine of laches barred Marilyn from obtaining relief.

---

[3]The record does not indicate what name or names appeared on the account prior to March 4, 1974. From that date to August 9, 1974, the names listed were "Diana Rudnick or Zelig Modnick." Ownership of the account was then transferred to "Diana Rudnick or Anna Modnick." Apparently, Diana Rudnick and Anna Modnick arè close relatives of Zelig. On July 30, 1976, the money in the account was transferred to another savings account.

It is unclear from the record whether any of the other.bank accounts investigated by the IRS contained community assets not disclosed during the dissolution proceedings.

[4]Marilyn alleged that during this time she and Zelig had lived together and resumed marital relations.

Following a hearing on November 26, 1980, the trial court denied Marilyn's motion. She appeals from that order.[5]

## II.

The principal question raised by this appeal concerns Zelig's concealment of a community property asset which should have been divided between the parties when their marriage was dissolved. Marilyn claims that the failure to disclose the existence of community property constitutes extrinsic fraud. ▮ ▮ ▮▮▮ Therefore, she maintains that the trial court erred in denying her motion to vacate the interlocutory and final judgments of dissolution.[6]

▮ The law is well settled that extrinsic fraud is a proper ground for setting aside an alimony award and a property settlement incorporated into a divorce decree. (*Kulchar* v. *Kulchar* (1969) 1 Cal.3d 467, 470-471 [82 Cal.Rptr. 489,

---

[5]Zelig claims that Marilyn's appeal must be dismissed as untimely because it was filed 62 days after entry of the trial court's minute order denying her motion to set aside the judgments. This contention is erroneous.

In 1981, when the notice of appeal was filed, rule 2(a) of the California Rules of Court read in pertinent part as follows: "Except as otherwise specifically provided by law, a notice of appeal shall be filed within 60 days after the date of mailing notice of entry of judgment by the clerk of the court pursuant to section 664.5 of the Code of Civil Procedure, *or within 60 days after the date of service of written notice of entry of judgment by any party upon the party filing the notice of appeal* . . . whichever is earliest . . . ." (Italics added.) Rule 40(g) stated that the term " '[j]udgment' includes any judgment, order or decree from which an appeal lies."

In the present case, the clerk of the court did not mail a notice of entry of judgment. Rather the trial court instructed Zelig's attorney to provide Marilyn with written notice. Thus, under former rule 2(a), Marilyn's notice of appeal was timely, if it was filed within 60 days after the date of service of notice by Zelig. The record indicates that Zelig's notice was mailed on December 6, 1980, and received by Marilyn's counsel two days later. Marilyn filed her notice of appeal on January 27, 1981, or well within the 60-day period.

[6]Zelig contends that the motion to set aside the dissolution judgments on the ground of extrinsic fraud was barred by the doctrine of res judicata. He argues that the fraud issue was conclusively decided against Marilyn on June 6, 1979, when the trial court denied her motion to vacate the interlocutory judgments.

"In determining the validity of a plea of res judicata three questions are pertinent: Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?" (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 813 [122 P.2d 892].)

Here, the minute order entered by the trial court states, "Motion denied without prejudice to being set for hearing on after-discovered community property issues. [¶] Petitioner granted leave to serve and file additional documentation in support and respondent to serve and file response." It does not appear from this order that the trial court reached a final judgment on the merits of the fraud issue. Rather, the parties were apparently given the opportunity to file additional documentation and further litigate the issue in another hearing.

Moreover, Zelig does not provide this court with a complete record of the proceedings below. The record contains neither Marilyn's motion nor the supporting and opposing points and authorities. A reporter's transcript of the hearing on the motion is also not included. On such a limited and ambiguous record, Zelig's res judicata defense will not be sustained. (See *Henn* v. *Henn* (1980) 26 Cal.3d 323, 331-332 [161 Cal.Rptr. 502, 605 P.2d 10].)

462 P.2d 17, 37 A.L.R.3d 1368]; *Jorgensen* v. *Jorgensen* (1948) 32 Cal.2d 13, 17-21 [193 P.2d 728].) ■ Extrinsic fraud is a broad concept that "tend[s] to encompass almost any set of extrinsic circumstances which deprive a party of a fair adversary hearing." (*In re Marriage of Park* (1980) 27 Cal.3d 337, 342 [165 Cal.Rptr. 792, 612 P.2d 882]; see also 5 Witkin, Cal. Procedure (2d ed. 1971) Attack on Judgment in Trial Court, § 183, p. 3752.) It "usually arises when a party . . . has been 'deliberately kept in ignorance of the action or proceeding, or in some other way fraudulently prevented from presenting his claim or defense.' [Citation.]" (*Kulchar, supra,* 1 Cal.3d at p. 471; *Orlando* v. *Orlando* (1966) 243 Cal.App.2d 248, 251-252 [52 Cal.Rptr. 142]; *Clark* v. *Clark* (1961) 195 Cal.App.2d 373, 376-379 [15 Cal.Rptr. 863].)

No abstract formula exists for determining whether a particular case involves extrinsic, rather than intrinsic, fraud. "It is necessary to examine the facts in the light of the policy that a party who failed to assemble all his evidence at the trial should not be privileged to relitigate a case, as well as the policy permitting a party to seek relief from a judgment entered in a proceeding in which he was deprived of a fair opportunity fully to present his case." (*Jorgensen* v. *Jorgensen, supra,* 32 Cal.2d at p. 19.)

■ The cases have uniformly recognized that the failure of one spouse to disclose the existence of community property assets constitutes extrinsic fraud. (*Boeseke* v. *Boeseke* (1974) 10 Cal.3d 844, 849-850 [112 Cal.Rptr. 401, 519 P.2d 161]; *Flores* v. *Arroyo* (1961) 56 Cal.2d 492, 494-496 [15 Cal.Rptr. 87, 364 P.2d 263]; *Jorgensen* v. *Jorgensen, supra,* 32 Cal.2d at p. 21; *In re Marriage of Coffin* (1976) 63 Cal.App.3d 139, 150-155 [133 Cal.Rptr. 583]; *Baker* v. *Baker* (1968) 260 Cal.App.2d 583, 585-586 [66 Cal.Rptr. 905]; *Orlando* v. *Orlando, supra,* 243 Cal.App.2d at pp. 252-253; *Clark* v. *Clark, supra,* 195 Cal.App.2d at pp. 380-381; *Dandini* v. *Dandini* (1953) 120 Cal.App.2d 211, 215-216 [260 P.2d 1033]; see also 5 Witkin, Cal. Procedure, *supra,* § 186, p. 3756.)

■ The key principle underlying these cases is that each spouse has an obligation to inform the other spouse of the existence of community property assets. This duty stems in part from the confidential nature of the marital relationship. (*Vai* v. *Bank of America* (1961) 56 Cal.2d 329, 349 [15 Cal.Rptr. 71, 364 P.2d 247] (dis. opn. of Traynor, J.); *Dandini* v. *Dandini, supra,* 120 Cal.App.2d at p. 216.) It also arises from the fiduciary relationship that exists between spouses with respect to the control of community property. (*Boeseke* v. *Boeseke, supra,* 10 Cal.3d at p. 849; *Jorgensen* v. *Jorgensen, supra,* 32 Cal.2d at p. 21; *Vai, supra,* 56 Cal.2d at pp. 337-338.)

When one spouse manages a community asset, he or she exercises control over the property interests of the other spouse. Therefore, the controlling

spouse has a duty to disclose the existence of that asset. (*Jorgensen* v. *Jorgensen, supra,* 32 Cal.2d at p. 21.) This fiduciary relationship does not terminate with the separation of the spouses or the commencement of a dissolution proceeding. (*Boeseke* v. *Boeseke, supra,* 10 Cal.2d at p. 849; *Vai* v. *Bank of America, supra,* 56 Cal.2d at p. 338.) The duty of disclosure continues until the marriage has been dissolved and the community property divided by the court.[7]

When a husband fails to reveal the existence of community property during the dissolution proceedings, he "deprives [his] wife of an opportunity to protect her rights in the concealed assets . . . ." (*Jorgensen* v. *Jorgensen, supra,* 32 Cal.2d at p. 21.) "[S]he [is] left in complete ignorance, and the ownership of the concealed property [is] never fairly before the court for adjudication." (*Clark* v. *Clark, supra,* 195 Cal.App.2d at p. 381.) ■■■ Thus, the nondisclosure constitutes extrinsic fraud and warrants equitable relief from a judgment dividing community property between the parties. (*Jorgensen, supra,* 32 Cal.2d at p. 21; *Clark, supra,* 195 Cal.App.2d at pp. 380-381.)

*Orlando* v. *Orlando, supra,* 243 Cal.App.2d 248 illustrates these principles well. In that case, the husband did not disclose during the trial of a divorce action that he had a bank account and a safe deposit box which contained community assets. He had concealed the existence of the safe deposit box by placing it in the names of his mother and sister. (*Id.,* at p. 251.) After the marriage was dissolved, the wife moved to vacate the interlocutory and final judgments on the ground of extrinsic fraud. Her motion was granted by the trial court and the husband appealed from that order.

The Court of Appeal affirmed the order, finding that the husband had clearly "committed fraudulent acts." (*Id.,* at p. 251.) Relying on *Jorgensen,* the court held that "where a husband conceals from his wife the existence of community assets whether in the course of negotiations for a property settlement agreement or in the course of litigating their claims to community property, such conduct is violative of his fiduciary duty to account to her for the community property, deprives her of an opportunity to fully present her case, constitutes extrinsic fraud and warrants equitable relief from a judgment." (*Id.,* at p. 253.)

*In re Marriage of Coffin, supra,* 63 Cal.App.3d 139 is also on point. In *Coffin,* the parties entered into a property settlement agreement that was incorporated into the divorce decree. The husband did not disclose that pension

---

[7]Under the Civil Code prior to 1975, only the husband was granted the right to manage and control community property. (*In re Marriage of Coffin, supra,* 63 Cal.App.3d at p. 154.) Nevertheless, the cases did not distinguish between husband and wife with respect to the duty of full disclosure. When the wife was entrusted with control of the community property, "she likewise occupie[d] a position of trust." (See, e.g., *Jorgensen, supra,* 32 Cal.2d at p. 21; *Orlando* v. *Orlando, supra,* 243 Cal.App.2d at p. 253, fn. 7.) Present law permits either spouse to manage and control community property. (Civ. Code, §§ 5125, 5127.)

benefits from his union membership had accrued to him. After learning of this community property asset, the wife moved to vacate the divorce decree on the ground of extrinsic fraud. The trial court granted her motion and the husband appealed from that order.

The Court of Appeal affirmed the judgment in favor of the wife, observing that "[t]he nondisclosure of community property has long been recognized as a basis for setting aside both property settlement agreements and property dispositions based thereon." (*Id.*, at p. 150.) The court concluded that "the [trial] court properly found the existence of extrinsic fraud justifying the exercise of the court's equity power to vacate the judgment . . . ." (*Id.*, at p. 155.)

■ Applying these principles to the present case, it is clear that Zelig's conduct amounted to extrinsic fraud. Not only did he fail to disclose the community property to his wife and the court, but he took deliberate steps to conceal the asset. Zelig removed his name from the account in 1974 and transferred ownership of it to two of his relatives. In addition, he did not report the income deposited in the account to the IRS. Marilyn only discovered the existence of the account after the tax fraud investigation began in August of 1978.

Zelig's concealment of the savings account was identical to the types of fraud committed in *Orlando* and *Coffin.* As in those cases, the hidden property was never before the trial court for a fair distribution. Therefore, Zelig's failure to disclose the existence of the community property asset constituted extrinsic fraud.

The cases relied upon by Zelig are inapposite. None of these decisions involved a spouse's concealment of the *existence* of a community asset. (See *In re Marriage of Connolly* (1979) 23 Cal.3d 590, 599-600 [153 Cal.Rptr. 423, 591 P.2d 911]; *Boeseke* v. *Boeseke, supra,* 10 Cal.3d at pp. 849-850; *Kulchar* v. *Kulchar, supra,* 1 Cal.3d at p. 474.) In *Boeseke, supra,* the wife sought to rescind a property settlement agreement on the ground that the husband had misrepresented the true value of their community property. The trial court rendered a judgment in favor of the husband.

In affirming the judgment, this court specifically distinguished between a failure to disclose the existence of community property and a misrepresentation of that property's value. (*Id.*, at pp. 849-850.) *Boeseke* found that so long as both spouses are aware that a community asset exists, one party's inaccurate opinion of that asset's true value may not amount to extrinsic fraud. (*Ibid.*) ■ "Valuation, like designation of property as being either community or separate, is an issue on which reasonable views often differ, and *in the absence of concealment of assets*—or facts materially affecting their value—a property settlement agreement may not later be set aside solely on the

basis of the managing spouse's inaccurate opinion of value or on his or her refusal to have rendered such opinion." (*Id.,* at p. 850, italics added.)

*In re Marriage of Connolly, supra,* 23 Cal.3d 590 is similarly distinguishable from the present case. The issue in *Connolly* was whether a husband had a fiduciary obligation in a divorce action to inform his wife of facts which would affect the value of stock owned by the community.[8] This court held that under the circumstances the husband had no duty of disclosure. (*Id.,* at p. 594.) The wife knew of the stock's existence. Moreover, the "*husband did not conceal material facts from* [*her*]." (*Id.,* at pp. 599-600, italics added.) The information he possessed concerning the stock's value was public knowledge and "readily ascertainable by wife or her counsel upon reasonable inquiry." (*Id.,* at p. 594; see also *id.,* at p. 598.)[9]

▉ Zelig also contends that the doctrine of laches bars Marilyn from obtaining equitable relief from the divorce decree. He asserts that she did not exercise diligence in seeking relief after her discovery of the fraud.

▉ "In passing on this argument, the court must look to the extent of prejudice to the opposing party, and to the reasonableness of the moving party in not filing the motion to vacate earlier." (*In re Marriage of Park, supra,* 27 Cal.3d at p. 345; see also *Weitz* v. *Yankosky* (1966) 63 Cal.2d 849, 857 [48 Cal.Rptr. 620, 409 P.2d 700].) These two factors are interrelated; "the greater the prejudice, the more timely must be the relief sought." (*McCreadie* v. *Arques* (1967) 248 Cal.App.2d 39, 47 [56 Cal.Rptr. 188].)

▉ Here, the prejudice resulting to Zelig from Marilyn's delay in filing the second motion was minimal, at most. Zelig contends that it would have been burdensome "to account for funds (amount and source) . . . acquired seven to ten years ago." However, even if Marilyn had sought relief immediately after discovering the fraud, Zelig would still have had to account for

---

[8]The information was that the stock would soon be subjected to a public offering at a price higher than its current value. (*Id.,* at p. 597.)

[9]There is a broad statement in *Connolly* that when parties to a marital dissolution proceeding elect to deal with each other at arm's length, "any fiduciary obligation otherwise owing is . . . terminated." (*Id.,* at p. 600.) It does not appear that this language was intended to abolish the rule that the duty to disclose the existence of community property remains in effect throughout the duration of the divorce action. That issue was not before the *Connolly* court. In addition, had the opinion intended to change such well-settled law, it seems reasonable that this court would have said so. Finally, *Connolly* cites *Jorgensen* v. *Jorgensen, supra,* 32 Cal.2d 13 as one authority for its broad statement concerning the termination of fiduciary obligations. As explained above, *Jorgensen* explicitly recognized that each spouse has a duty to disclose the existence of community property during a divorce action. (*Id.,* at p. 21; see *ante,* p. 906.)

For these reasons, the language in *Connolly* should not be viewed as abolishing the obligation of each spouse to fully disclose the existence of community property.

the concealed property over a period of approximately eight years.[10] The delay in filing the second motion to vacate did not significantly add to this burden. In addition, Zelig cannot reasonably claim that he was surprised by Marilyn's attempt to set aside the divorce decree. He was well aware that he had concealed community property and that once Marilyn discovered the fraud, she was likely to seek her fair share.[11]

In determining the reasonableness of Marilyn's delay in filing the second motion, this court is "guided by the applicable statute of limitations for an action at law . . . ." (*Vai* v. *Bank of America, supra,* 56 Cal.2d at p. 343; see also *Protopappas* v. *Protopappas* (1963) 213 Cal.App.2d 659, 665 [28 Cal.Rptr. 884].) Code of Civil Procedure section 338, subdivision 4 states that an action for relief on the ground of fraud must commence within three years of the aggrieved party's discovery of "the facts constituting the fraud." Here, Marilyn did not discover Zelig's fraud until the IRS began its investigation in August of 1978. She filed the second motion to vacate the divorce decree two years later.

Moreover, the record does not establish that Marilyn was dilatory during this two-year period. When she learned of the IRS investigation, she was suffering from chronic depression. She did not immediately understand that Zelig had fraudulently concealed community property from her.

On February 13, 1979, Marilyn executed a declaration in support of a motion to set aside the interlocutory judgment of dissolution. That motion was promptly filed on March 12, 1979—i.e., only eight months after discovery of the IRS investigation. After one continuance, the trial court heard and denied the motion without prejudice to an additional hearing on the "after-discovered community property issues." Another hearing was set for July 16, 1979.

At this time, Zelig informed Marilyn that she would not have to pursue legal remedies to obtain a fair division of the hidden community property. In reliance on this advice, she abandoned her motion, discharged her attorney, and had several meetings with her former husband and his counsel. When the negotiations failed to resolve the dispute, Marilyn again sought the assistance of counsel. She retained one attorney, but he withdrew from the case shortly thereafter.

In January of 1980, Marilyn's present counsel agreed to represent her. For six months, she negotiated with Zelig's attorney for an accounting and payment

---

[10]The concealed bank account was opened in 1970.

[11]Zelig also claims that he was prejudiced because in reliance on the divorce decree, he filed income tax returns as a single person. This contention necessarily assumes that the relief due Marilyn includes nullifying the dissolution of the marital relationship. Although Marilyn sought to have the entire divorce decree vacated, the proper remedy is to set aside only the property provisions of the judgments. (See *post,* p. 910.)

of Marilyn's interest in the concealed property. Within 30 days after the negotiations broke down, Marilyn's counsel moved to set aside the interlocutory and final judgments of dissolution on August 5, 1980. Three months later, the trial court denied the motion.

Under these circumstances, the doctrine of laches does not preclude Marilyn's claim of extrinsic fraud. Marilyn was reasonably diligent in seeking relief following her discovery that Zelig had hidden community property assets from her. In addition, the delay in filing the second motion to vacate the judgments resulted in little, if any, prejudice to Zelig.

It remains for this court to determine the relief to which Marilyn is entitled. Her motion asked the trial court to set aside the interlocutory and final judgments of dissolution in their entirety. However, a divorce decree is divisible in California. (*Lopez* v. *Lopez* (1965) 63 Cal.2d 735, 737-738 [48 Cal.Rptr. 136, 408 P.2d 744].) As this court has explained, "Severance of a personal relationship which the law has found to be unworkable and, as a result, injurious to the public welfare is not dependent upon final settlement of property disputes." (*Hull* v. *Superior Court* (1960) 54 Cal.2d 139, 147 [5 Cal.Rptr. 1, 352 P.2d 161].) Thus, where a showing of extrinsic fraud relates solely to the property provisions of a divorce decree, only those provisions are set aside and that part of the divorce decree terminating the marital relationship remains in effect. (*Lopez, supra,* 63 Cal.2d at p. 738; *Orlando* v. *Orlando, supra,* 243 Cal.App.2d at p. 251, fn. 5.)

In the present case, the extrinsic fraud committed by Zelig did not affect the adjudication of the parties' personal status. Thus, Marilyn is only entitled to have the property settlement and the award of spousal support contained in the divorce decree set aside.[12]

### III.

As a separate ground for setting aside the divorce decree, Marilyn contends that she and Zelig became reconciled after entry of the in-

---

[12]Zelig contends that, as in *Henn* v. *Henn, supra,* 26 Cal.3d 323, Marilyn's remedy is limited to filing a separate suit to establish her interest in the community property. However, *Henn* did not involve the concealment of a community property asset. Rather, *Henn* held that where a former spouse claims an interest in an undivided asset "*known* to exist at the time of the initial judicial distribution of the marital community," that claim may only be adjudicated in a separate action. (*Id.,* at p. 333, italics added.) By contrast, an interest claimed in an asset concealed by one party during the initial distribution of community property may be adjudicated in a motion to set aside or modify the prior decree. (See, e.g., *Lopez* v. *Lopez, supra,* 63 Cal.2d 735; *In re Marriage of Coffin, supra,* 63 Cal.App.3d at p. 150; *Orlando* v. *Orlando, supra,* 243 Cal.App.2d at pp. 249-250.)

terlocutory judgment of dissolution.[13] ■■■ "When parties become reconciled after an interlocutory decree and live together as husband and wife, the right to a final decree is destroyed [citations], and they are entitled to such rights as arise from the legal relation of husband and wife." (*Estate of Abila* (1948) 32 Cal.2d 559, 561 [197 P.2d 10]; *Cochran v. Cochran* (1970) 13 Cal.App.3d 339, 346 [91 Cal.Rptr. 630]; *Kelley v. Kelley* (1969) 272 Cal.App.2d 379, 381 [77 Cal.Rptr. 358].)

Neither party may compel the trial court to enter a final judgment of dissolution. (*Cochran v. Cochran, supra,* 13 Cal.App.3d at p. 346; *Nacht v. Nacht* (1959) 167 Cal.App.2d 254, 261 [334 P.2d 275]; *Angell v. Angell* (1948) 84 Cal.App.2d 339, 343 [191 P.2d 54].) Rather, "[i]t is proper" for the trial court to set aside the interlocutory decree and dismiss the divorce action. (*Cochran, supra,* 13 Cal.App.3d at p. 346.) A new action for dissolution of the marriage may be filed if a cause for divorce arises subsequent to the reconciliation. (*Ibid.*) If one spouse secures a final decree despite a reconciliation during the interlocutory period, that judgment may be set aside. (*Nelson v. Nelson* (1936) 7 Cal.2d 449, 452 [60 P.2d 982].)

■■■ The burden of proof in the trial court rests with the party asserting the fact of reconciliation. (*Cochran v. Cochran, supra,* 13 Cal.App.3d at p. 347; *Kelley v. Kelley, supra,* 272 Cal.App.2d at p. 381.) That party must establish by "clear and cogent proof" that the spouses mutually intended to resume their marital status and to live together on a permanent basis. (*Estate of Abila, supra,* 32 Cal.2d at p. 561; *Kelley v. Kelley, supra,* 272 Cal.App.2d at pp. 381-382; *Mackie v. Mackie* (1962) 208 Cal.App.2d 547, 550 [25 Cal.Rptr. 336].)

The intention to reunite must be unconditional and contemplate a complete restoration of all marital rights. (*Kelley v. Kelley, supra,* 272 Cal.App.2d at p. 382; *Angell v. Angell, supra,* 84 Cal.App.2d at p. 343.) These rights "include not only cohabitation in the sexual sense, but also those rights pertinent to the companionate aspects of marriage and those pertaining to marital property." (*Kelley, supra,* 272 Cal.App.2d at p. 382, fn. omitted.)[14]

---

[13]Marilyn also argues that a reconciliation occurred prior to the interlocutory decree. However, the well-settled rule is that "[i]nterlocutory divorce decrees are res judicata as to all questions determined therein . . . ." (*Kulchar v. Kulchar, supra,* 1 Cal.3d at p. 470 and cases cited therein.) In the present case, the interlocutory judgment conclusively determined that irreconcilable differences existed between Marilyn and Zelig at that time. Marilyn may not relitigate that issue.

[14]The cases also require as an additional element of reconciliation that the prevailing spouse in the divorce action unconditionally forgive the wrongdoing of the other party. (See, e.g., *Cochran v. Cochran, supra,* 13 Cal.App.3d at p. 347; *Mackie v. Mackie, supra,* 208 Cal.App.2d at p. 550; *Nacht v. Nacht, supra,* 167 Cal.App.2d at p. 261.) However, all of these cases arose before the effective date of the Family Law Act (Jan. 1, 1970) which instituted no-fault divorce in California. (Stats. 1969, ch. 1608, § 8, p. 3314, and § 37, p. 3351.)

To continue to require that the conduct of the offending party be condoned when no finding of

 Mere cohabitation after entry of the interlocutory decree, even for a long period of time, does not establish that the parties have reconciled as a matter of law. (*Waller* v. *Waller* (1970) 3 Cal.App.3d 456, 462-463 [83 Cal.Rptr. 533]; *Kelley* v. *Kelley, supra,* 272 Cal.App.2d at p. 382 [eight years], *Mackie* v. *Mackie, supra,* 208 Cal.App.2d at p. 550.) "Length of cohabitation while significant as a matter of evidence of reconciliation is not conclusive." (*Kelley, supra,* 272 Cal.App.2d at p. 382.) "The controlling question is the actual finding of an intent to reconcile." (*Waller, supra,* 3 Cal.App.3d at p. 463.)

 Here, the record indicates that the parties initially separated in September of 1972. They resumed living together from March of 1973 to September of 1974, shortly before Marilyn filed a petition for dissolution of the marriage. The parties remained separated for the next year. After their marriage was dissolved by the trial court on April 26, 1976, they cohabited on an intermittent basis until the final breakup in September of 1978. In addition, the parties engaged in various social activities together. These included travelling, celebrating holidays, entertaining guests, and seeing movies and shows.

Although this evidence demonstrates a close relationship between Zelig and Marilyn, it does not conclusively establish that they had mutually intended to permanently reunite as husband and wife. Indeed, nowhere in her declarations does Marilyn even allege that such a reconciliation had occurred. Zelig testified in his deposition only that during the interlocutory period "we had *attempted* to see if we could reconcile." (Italics added.)

Significantly, each of the parties filed income tax returns as a single person and reported a separate address to the IRS. In addition, there was evidence that Zelig and Marilyn had not agreed to a restoration of the property rights of marriage. During the interlocutory period, Zelig used his income to buy a house which the parties treated as his separate property. It also appears that Zelig continued to make the court-ordered support payments to Marilyn. This is "a fact consistent with a continued status of divorce but inconsistent with marriage." (*Kelley* v. *Kelley, supra,* 272 Cal.App.2d at p. 382.)

Under these circumstances, there was sufficient evidence to rebut Marilyn's claim that she and Zelig had reconciled during the interlocutory period. The

---

fault is made in the judgment of dissolution would be illogical. In addition, such a requirement would undermine the policies underlying the no-fault based divorce system. The principal motivation for modifying the law was that "the fault concept was unrelated to the actual causes of marital failure." (See Comment, *The End of Innocence: Elimination of Fault in California Divorce Law* (1970) 17 UCLA L.Rev. 1306, 1310, fn. omitted.) Thus, under the present no-fault divorce law, the test for determining whether there has been a reconciliation since the interlocutory decree considers only the intent of the parties to permanently reunite as husband and wife.

parties did not unconditionally agree to live together as husband and wife on a permanent basis.[15]

## IV.

■ In the present case, Zelig deliberately concealed the existence of a community property asset which should have been distributed between the parties at the time the marriage was dissolved. This fraud deprived Marilyn of an opportunity to litigate her interest in the concealed property. As a result, the property provisions of the divorce decree must be set aside. To hold otherwise would serve to encourage spouses to engage in the objectionable practice of secreting community property assets.

The order of the trial court denying Marilyn's motion to vacate the interlocutory and final judgments of dissolution is reversed insofar as it relates to the property settlement incorporated into the divorce decree and the award of spousal support. In all other respects, the order is affirmed. The case is remanded to the trial court for further proceedings consistent with this opinion.

Richardson, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

Mosk, J., concurred in the judgment.

---

[15]Marilyn raises two other contentions on appeal. First, she contends that the trial court should have held an adversarial hearing concerning reconciliation before entering the final judgment dissolving the marriage. Since Marilyn did not raise this claim below, it is not properly before this court. (*Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 784 [174 Cal. Rptr. 348]; see generally, 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 276, pp. 4264-4265.)

In addition, Marilyn claims that the trial court should have granted her motion to compel Zelig to answer certain deposition questions. To list each of the numerous questions which Zelig refused to answer would serve no beneficial purpose. It is sufficient to say that the trial court did not abuse its discretion in denying the motion. Many of the questions were confusing or over-broad, while others called for irrelevant or cumulative information. In addition, the trial court's refusal to compel discovery did not prejudice Marilyn's ability to present her claim to the trial court that the divorce decree should be vacated.