[No. B022384. Second Dist., Div. One. Sept. 15, 1987.]

MELVIN HUGHES, Plaintiff and Appellant, v.
ATLANTIC PACIFIC CONSTRUCTION COMPANY, Defendant
and Respondent.

988

COUNSEL

John B. Mestad for Plaintiff and Appellant.

Hagenbaugh & Murphy and David L. Winter for Defendant and Respondent.

OPINION

HANSON (Thaxton), Acting P. J.—

### INTRODUCTION

Plaintiff Melvin Hughes (plaintiff and/or Hughes), an employee of sub-contractor Steelform Contracting Company (Steelform) sought damages for personal injuries sustained on the job from defendant general contractor, Atlantic Pacific Construction Company (defendant and/or Atlantic Pacific).

Trial was by jury. After plaintiff presented his evidence, the trial court granted defendant Atlantic Pacific's motion for a judgment of nonsuit or a directed verdict on the issue of "peculiar risk." By special verdict, the jury decided that defendant Atlantic Pacific had no control over that portion of the construction premises where plaintiff was injured. The jury found for defendant.[1] Plaintiff's motion for new trial was denied. Plaintiff has appealed from the judgment in timely fashion. We affirm.

---

[1] This "third party" litigation commenced against defendant Atlantic Pacific on the theory that, as general contractor, defendant Atlantic Pacific had control over the construction site and was liable to plaintiff for failure to exercise such control with reasonable care and provide a safe place to work. Defendant Atlantic Pacific assigned defense of the action to Steelform, the subcontractor, pursuant to the "hold harmless" agreement Steelform had executed with defendant. Steelform filed a complaint in intervention to recover the monies expended under workers' compensation. Steelform then assigned its rights asserted in the complaint in intervention to defendant Atlantic Pacific. Plaintiff sought to quash this assignment at trial, but his motion was denied. As indicated, the jury found for defendant Atlantic Pacific.

FACTUAL BACKGROUND

The facts were presented on appeal by means of stipulated settled statements containing an agreed summary of the testimony of the witnesses (see rule 7, Cal. Rules of Court). In addition, this court, pursuant to California Rules of Court, rule 12a, augmented the record on appeal by ordering up the exhibits from the superior court.

Defendant Atlantic Pacific was the general contractor for The Atrium, a six-floor building project on Ventura Boulevard in Encino, California. It consisted of a U-shaped complex of three towers: the west tower, the central tower, and the east tower. The plans included a seismic joint from the second floor up, separating the west tower from the center tower. This separation would allow the towers to move independently in the event of an earthquake.

The floors of these structures consisted of corrugated metal sheets (referred to as a Robinson deck) welded to the top of the I-beams on each floor, upon which a six-inch concrete slab was poured. The plan for treatment of the seismic joint called for plywood forms to be constructed in the joint in preparation for pouring in cement. Plaintiff's employer, Steelform, was the subcontractor with the responsibility for constructing the wood forms for concrete pouring and for pouring the concrete for the entire project.

The seismic joint ran the entire length—some 47 feet—between the center and west towers. On each side of the opening were metal I-beams running parallel to each other. The forms receiving concrete in the seismic joint area consisted of five-eighths-inch laminated plywood sheets cut to fit either under or flush with the upper flange between the two parallel I-beams. The plywood was held up to the top flange of the I-beams by four by four-inch pieces of wood as cross members cut to fit between the web of the I-beams. The plywood was nailed to the four by fours. These four-by-fours were in turn held up by wedging two by fours of wood between the bottom of the four by fours and the top of the lower flanges of the I-beams. This method of constructing concrete forms in expansion joints was standard procedure and customary in the construction industry.

The subcontractor Steelform employed plaintiff as a cement finisher. On June 20, 1980, he was working on the fifth floor of the building where cement was being poured. He testified that he had crossed over the expansion joint several times and stepped on the plywood, and other coemployees and other subcontractors' workmen had also walked over the area. However, between 4 and 4:30 p.m. on that date, when he stepped on a panel of

plywood in the expansion joint, it gave way and he fell, catching himself with his arms; his foreman, Mr. Millhouse, came and helped him up. Plaintiff testified that there were no guardrails around or bridges over the expansion joint. The plaintiff also identified plaintiff's exhibits V-1 and V-2, two photographs taken by plaintiff's attorney showing the area of the expansion joint involved in the incident.[2]

Morris Farkas, plaintiff's expert witness, stated that his testimony was solely based on a blueprint of parking level 2 (plaintiff's exhibit No. 5) and the deposition of Adolf Fruehwirth, an employee of subcontractor Steelform. Farkas never saw any plans for the expansion joint except a rough sketch in the Fruehwirth deposition. He stated he had never studied the complete plans nor at any time visited the building either while under construction or in the completed state.

Farkas, after describing the forming of the expansion joint in preparation for pouring the cement, stated that in his opinion the accident was caused by plaintiff's employer (subcontractor Steelform) using pieces of plywood that were too small and not properly secured. He testified that the gap should have been bridged with two-by-four planks cleated together with guardrails to prevent workers from stepping on the plywood. However, he further testified that if the expansion joint gap was less than 24 inches, there was no need for any such safety devices.

The deposition of Adolf Fruehwirth, foreman for Steelform, was read to the jury. He testified that he had no knowledge of plaintiff's accident until he (Fruehwirth) was asked for a statement about two years later; that Steelform carpenters constructed the wood forms which were all installed in accordance with trade custom; that Nathan D. Millhouse was the foreman of the cement pouring crew; that the Robinson deck was in place over the steel beams and girders before Steelform came on the job; that the separation joint was "about two feet. Maybe two feet plus or minus"; that although he did not remember doing it at the specific place where plaintiff stepped, it was standard procedure for him to generally inspect the wood forms and to walk on it to test to see if it was safe; and that he treated the

---

[2] Plaintiff's exhibits V-1 and V-2, photographs taken by plaintiff's attorney, show a steel plate flush with the floor in the corridor over the seismic joint after the slab was poured and the walls and doors installed. Exhibit V-1 shows that the steel plate overlapped the underlying concrete slab. The actual gap between the concrete slab is a fraction (less than one-third) of the length of the plates. (See appen. A, *post*, p. 1004.)

Three other photographs taken by plaintiff's attorney and placed into evidence by defendant (defendant's exhibits Nos. W-2, W-3, and W-4) show, by a metal tape measure in the photographs, that the actual gap between the concrete slab floors after the concrete was poured was 16-1/2 inches. (See appen. A, *post*, p. 1004.)

expansion joint on all the floors the same way and never had any such failure.

Witness Nathan D. Millhouse, foreman for subcontractor Steelform, testified that he held safety meetings and warned all workers, including plaintiff Hughes, to be careful of the expansion joint area; and that he did not see the accident happen but immediately after saw plaintiff Hughes with one leg in the gap, and helped plaintiff out of the hole.

Witness Charles Alva, inspector of the welding on the job, testified that the expansion joint opening was covered during welding of the Robinson decking before the area was turned over to Steelform to construct the concrete forms and pour the concrete. He testified that the opening between the decking at the expansion joint on the fifth floor was approximately 12 inches, and that concrete workers, as a trade, work alone and no other trades would be in the area during the pouring of concrete.

Witness Fritz von der Au, an officer for the defendant general contractor, Atlantic Pacific, testified that plaintiff's employer, Steelform, chose, designed and installed the plywood forms in the expansion joint; that temporary covers existed over the expansion joint which were removed by Steelform and their forms substituted; that such removal was necessary in order to complete the concrete forms.

Defendant Atlantic Pacific's exhibit No. "K," plans for the steel beams for Steg Iron Works, shows that before the Robinson deck and forms were added the seismic gap was 2 feet 10 inches (34 inches) between the center of the I-beams.

Witness von der Au testified in substance that the expansion gap was smaller than the two feet ten-inch width of the expansion gap on the fifth floor due to the width of the flange, the extended Robinson deck and wooden forms. Defendant's exhibit "T," detail 7, shows the construction plans called for a 24-1/2-inch gap on the fifth floor upon completion (see appen. B). However, the actual expansion gap upon completion was smaller, i.e., 16-1/2 inches. (See appen. A, *post*, p. 1004.)

The deposition of Anthony C. Alosi, project superintendent for defendant Atlantic Pacific, was read to the jury. He had over 40 years experience in the construction business. He testified that Steelform was the subcontractor for the concrete work, forming and the pouring of concrete, and that seismic joints are quite common in earthquake-prone California. He stated that although the expansion gap was originally two feet ten inches (thirty-four inches) center to center of the I-beams, the gap was actually much narrower

since the Robinson metal deck (which was welded to the steel beams) cantilevered out five, six or seven inches over the flanges of the I-beams with rebars on the edges to support the concrete. He further testified that before Steelform came on the job a vertical pipe with a cable ran around the decking for safety purposes; that the pipe and cable were removed after the plywood forms were in place because they would interfere with the pouring and so they would not be embedded in the concrete; and that the wooden form further closed the expansion gap to a 10-, 12- or 14-inch gap. Witness Alosi testified that he was not aware an accident happened and it was never reported to him.

Witness Morrie Wolocatiuk, an employee of Steelform at the time of the accident working as a project superintendent, testified that the plywood form for the temporary expansion joint form was chosen, designed, made, placed and removed by Steelform, and that any bridge work or covering that had been in the area of the expansion joint prior to the time for the pouring of the concrete must be moved before the concrete can be poured.

Witness James P. Roberts, called by defendant Atlantic Pacific, qualified as an expert in construction safety and construction procedures. Mr. Roberts testified, based upon a review of the building plans, visits to the scene, a review of job records, a review of photographs taken by plaintiff's attorney, and interviews with people involved, that everything regarding the accident was in the control of plaintiff Hughes's employer Steelform; that at the job site Atlantic Pacific was in charge of seeing that the work was done according to plans and specifications and within the time schedule of construction; that the manner of doing the specific work, including the choice of tools and forms for the job, was left to the subcontractors; that the plywood form chosen for the expansion joint was a standard construction device; that in addition to the manlift in the west tower, there were stairways present in each tower at the time of the incident; that any cover over the expansion joint had to be removed so that the pouring of the concrete could be done; that the plywood form would be placed below the Robinson decking; that the concrete would be poured to the size of the opening of the completed expansion gap; that the plans for the building, exhibit "T," show that the finished gap for the fifth floor is to be 12 inches; that the plans for the roof expansion joint show the gap to be 16 inches; that the actual roof gap as inspected by Mr. Roberts was 16 inches; that the size of the expansion gap was larger at the roof and would be smaller at the fifth floor; and that the job site as described to him and established by the plans and specifications was a reasonably safe job site.

## ISSUES

On appeal, plaintiff Hughes contends: (1) that the trial court erred when it considered and rejected the applicability of the "peculiar risk" doctrine to

this litigation by granting nonsuit on the issue, failing to instruct the jury on it, and requesting the special verdict; (2) that the trial court erred in denying plaintiff's motion to find that the finding of the Workers' Compensation Appeals Board was res judicata; and (3) that the trial court also erred in denying plaintiff's motion to quash the assignment of the lien of plaintiff-in-intervention.

## STANDARD OF REVIEW

■ When reviewing the grant of a judgment of nonsuit, an appellate court approaches its task mindful that the losing party below has been precluded from presenting the case to the trier of fact. This circumstance compels the court to view the record and the losing party's contentions on appeal in a light most favorable to that party.

A similar duty is imposed on the trial court. "The California Supreme Court has recently reiterated the standards applicable to review of a motion for nonsuit under Code of Civil Procedure 581c. [Citation.] 'A motion for nonsuit is a procedural device which allows a defendant to challenge the sufficiency of plaintiff's evidence to submit the case to the jury. [Citation.] Because a grant of the motion serves to take a case from the jury's consideration, courts traditionally have taken a very restrictive view of the circumstances under which a nonsuit is proper. ■ The rule is that a trial court may not grant a defendant's motion for nonsuit if plaintiff's evidence would support a jury verdict in plaintiff's favor. [Citations.] [¶] In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor. . . ." [Citation.]' [Citation.]" (*Huang* v. *Garner* (1984) 157 Cal.App.3d 404, 412 [203 Cal.Rptr. 800].)

The *Huang* principles apply when one central issue, rather than the entire case, has been removed from jury consideration, as occurred in the matter before us.

## DISCUSSION

## I.

■ Plaintiff first contends that the trial court erred when, upon defendant's motion, it considered and rejected the applicability of the "peculiar

risk" doctrine to this litigation. The trial court granted defendant's motion of nonsuit as to this issue, refused plaintiff's jury instruction request concerning it, and requested that the jury make a special finding about control of the premises.

■ Defendant as a general contractor would not ordinarily be liable for the acts or omissions of a subcontractor engaged by defendant, over which the employer had no control or right of control. (*Anderson* v. *Chancellor Western Oil Dev. Corp.* (1975) 53 Cal.App.3d 235, 239 [125 Cal.Rptr. 640]; *Elder* v. *Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650, 658-659 [136 Cal.Rptr. 203]; Rest.2d Torts, §§ 413, 416.)

The "peculiar risk" or "special risk" doctrine forms an exception to this principle of nonliability. ■ "[O]ne who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar [or special] risk of bodily harm to others unless special precautions are taken, is liable for bodily harm . . . caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise. . . ." (BAJI No. 13.21, approved in *Griesel* v. *Dart Industries, Inc.* (1979) 3 Cal.3d 578 [153 Cal.Rptr. 213, 591 P.2d 503].)

*Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 508 [156 Cal.Rptr. 41, 595 P.2d 619] stated that "[a] number of considerations have led courts to depart from the rule of nonliability of an employer for the torts of an independent contractor. Some of the principal ones are that the employer is the one who primarily benefits from the contractor's work, the employer selects the contractor and is free to insist on a competent and financially responsible one, the employer is in a position to demand indemnity from the contractor, the insurance necessary to distribute the risk is properly a cost of the employer's business, and the performance of the duty of care is one of great public importance." These considerations are particularly appropriate when the "employer" is a general contractor with expertise in the work to be performed, i.e., construction of a large commercial building.

BAJI No. 13.21.4 (1984 rev.) appears relevant to a trial court's determination of whether the "peculiar risk" doctrine should be presented to the trier of fact.[3] *Aceves* also states that "[t]he determination of whether a

---

[3] "The term 'peculiar risk' of bodily harm as used in these instructions is a risk:
"1. Which is peculiar to the work to be done,
"2. Which arises out of the character of the work or the place where the work is to be done, and

danger is recognizable requires consideration of the employer's knowledge and experience in the field of work to be done." (23 Cal.3d at p. 509.) *Aceves* held that demolition of a building involved a "special risk" of harm.

Since the "peculiar risk" doctrine depends upon the particular facts developed on a case-by-case basis, we have set forth in some detail the testimony upon which the trial court based its rejection of the doctrine. ■ As *Jimenez* v. *Pacific Western Construction Co.* (1986) 185 Cal.App.3d 102, 110 [229 Cal.Rptr. 575] explained, "[t]he analysis of the applicability of the peculiar risk doctrine to a particular fact situation can be broken down into two elements: (1) whether the work is likely to create a peculiar risk of harm unless special precautions are taken; and (2) whether the employer should have recognized that the work was likely to create such a risk."

■ "As was stated by the Supreme Court in *Aceves, supra,* 24 Cal.3d 502, the peculiar risk is one which is peculiar to the work to be done and arises out of its character and the place where it is to be done and is something other than an ordinary and customary danger which may arise in the course of the work or of normal human activity. It has reference only to a special, recognizable danger arising out of the work itself." (*Stark* v. *Weeks Real Estate* (1979) 94 Cal.App.3d 965, 971 [156 Cal.Rptr. 701].)[4]

---

"3. Against which a reasonable person with the knowledge and experience of the defendant would recognize the necessity of taking special precautions.

"The term 'peculiar risk' does not mean that the risk must be one which is abnormal to the type of work done, or that it must be an abnormally great risk. It has reference only to a special, recognizable danger arising out of the work itself."

[4]*Stark* v. *Weeks Real Estate, supra,* 94 Cal.App.3d 965, 970-971, states: "Because the abstract definition of the doctrine is elusive in practical application its contours can best be determined by example. Examples of work which has been held to create peculiar risk of physical harm absent special precautions are: The danger of being struck by a wall being knocked down on a demolition job (*Aceves* v. *Regal Pale Brewing Co., supra*); the risk of a cave-in while working in a nine-foot deep unshored and unsloped trench (*Griesel* v. *Dart Industries, Inc.* (1979) 23 Cal.3d 578 [153 Cal.Rptr. 213, 591 P.2d 503]); see also *Widman* v. *Rossmoor Sanitation, Inc.* (1971) 19 Cal.App.3d 734 [97 Cal.Rptr. 52]); eradicating white line markings on the street with the risk a motorist would injure a workman (*Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245 [66 Cal.Rptr. 20, 437 P.2d 508]); repairing a metal tank from the inside by forcing buckled metal outward with the risk that the metal would spring inward and injure a workman (*Ferrel* v. *Safway Steel Scaffolds* (1962) 57 Cal.2d 651 [21 Cal.Rptr. 575, 371 P.2d 311]); painting the inside of a tank with the risk of an explosion because of inadequate ventilation (*Woolen* v. *Aerojet General Corp.* (1962) 57 Cal.2d 407 [20 Cal.Rptr. 12, 369 P.2d 708]); see also *McDonald* v. *City of Oakland* (1965) 233 Cal.App.2d 672 [43 Cal.Rptr. 799]); cement work on a bridge 20 feet high with no scaffolding or railing—worker fell from bridge (*Fonseca* v. *County of Orange* (1972) 28 Cal.App.3d 361 [104 Cal.Rptr. 566]); erecting and cross-girdering 30-foot steel column for a water tower without safety equipment to keep plaintiff from falling off tower (*Stilson* v. *Moulton-Niguel Water Dist.* (1971) 21 Cal.App.3d 928 [98 Cal.Rptr. 914]); building bridge over high voltage wires—worker injured when boom of crane touched wire (*Walker* v. *Capistrano Saddle Club* (1970) 12 Cal.App.3d 894 [90 Cal.Rptr. 912]); building concrete wall and floor without railings to a height of 10 feet with the risk that a workman might fall or be pushed from the wall (*Morehouse* v. *Taubman Co.*

In the case at bench, the building plans envisioned a seismic joint of over 24-1/2 inches in width, running the length of the fifth floor of the west and central towers of this high rise project. (See appen. B, *post*, p. 1005.) While that width would narrow substantially as construction progressed, plaintiff argued that the gap between the towers at the outset and during construction presented a "peculiar risk" to those working around it on the building's upper floors.

However, after examination of the entire record, and affording plaintiff's evidence the deference required by the applicable standard of review, we conclude as a matter of law that the plans and procedures employed for constructing the particular expansion joints did not come within the ambit of "peculiar risk," and that the trial court disposed of the issue correctly.

The record clarifies that due to the earthquake potential in California, it is common procedure to provide seismic joints in high-rise buildings, and sound public policy encourages such construction. Employment in the construction of high-rise buildings does involve risk. That in itself, however, does not invoke the "peculiar risk" doctrine; the precise work at issue must create a peculiar risk of harm.

Uncontroverted trial testimony showed that the manner in which Steelform, entirely in charge of this phase of construction, constructed the forms for the seismic joints conformed to standard construction industry practice. When the forms were properly constructed, the laminated plywood was safe to walk on, being underpinned by four-by-four cross members and held up by wedging two by fours between the lower flange of the I-beams and the four by fours.

The exhibits show that at the time of plaintiff's accident, the gap where plaintiff stepped on the plywood was less than 24 inches wide, due to the width of the flanges on the I-beams, the cantilevered Robinson deck and the forms. (See appens. A and B, *post*, pp. 1004-1005.) The evidence shows and common sense dictates that the plywood forms could not be inserted and the concrete poured without removing the protective devices originally installed by defendant Atlantic Pacific. Plaintiff's expert witness (Farkas) offered the opinion that the plywood had given way under plaintiff because other employees of Steelform used pieces of plywood that were too small and had not properly secured the wedging of a two by four as an underpin-

---

(1970) 5 Cal.App.3d 548 [85 Cal.Rptr. 308]); backing a loaded truck on a construction project without a warning device with the risk that worker might be run down (*Anderson* v. *L. C. Smith Constr. Co.* (1969) 276 Cal.App.2d 436 [81 Cal.Rptr. 73]).

"All of these cases involved risks which fall well within the parameters of the peculiar or special risk doctrine as defined by the Restatement and the *Aceves* case."

ning. Moreover, plaintiff's expert, Farkas, testified that if the gap was less than 24 inches, no safety devices were necessary.

■   Liability under the peculiar risk doctrine does not extend to so-called "collateral" or "casual" negligence on the part of the contractor or his employees." (*Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 252.) Negligent selection of pieces of plywood and its wedging support bears no relation to a peculiar risk inherent in the work for which liability could be imposed. The possibility of routine negligence in the performance of work provides no basis for such liability. (See *Stark* v. *Weeks Real Estate, supra,* 94 Cal.App.3d 965, 971; Rest.2d Torts, § 413, coms. *b* and *d.*)

The cases finding the "peculiar risk" doctrine applicable are factually distinguishable. *Stark* v. *Weeks Real Estate, supra,* 94 Cal.App.3d 965 provides more analogous facts and a more persuasive rationale.[5]

*Stark* v. *Weeks Real Estate, supra,* 94 Cal.App.3d 965, 972-973 provides the essential rationale for the case at bench. As in *Stark,* we do not believe that the risk involved from the type of construction activity in the case at bench is the type of risk which the peculiar risk doctrine covers. The authorities cited in *Stark,* and listed in footnote 4, *ante,* establish that the peculiar risk of harm must be inherent in the work itself, and arise out of its character.   ■   The doctrine does not apply to injuries resulting from the independent contractor's negligence for failing to take precautions as to the work's operative details which a careful contractor would take in its performance, such as the failure to use reasonable care to insure that the laminated plywood and wedges were properly installed which Steelform provided to its workers.

These are ordinary, customary risks, apart from the nature of the work itself. Every owner employing an independent contractor can anticipate that the independent contractor's employees may improperly install forms, thus endangering themselves and third parties. "Such a risk is always present.

---

[5] In *Stark* a carpenter employed by a contractor building homes on defendant's property sued for personal injuries sustained while operating a power saw. The trial court entered summary judgment for defendant pursuant to the rule that one who employs an independent contractor is not liable for injuries caused by the negligence of the contractor. In affirming the judgment, the Court of Appeal held that defendant's injuries did not come within the "peculiar harm" exception to the general rule of nonliability. The court held that while one who employs an independent contractor is subject to liability for physical harm caused to others when the employers should recognize the particular work as likely to create a peculiar risk of physical harm to others unless special precautions are taken, it would be entirely impracticable, unreasonable and too expensive to expect an owner to set up a system to monitor the manner in which tools are used by workmen and guard against misuse or negligent use of such tools by workmen in day-to-day operations on the job.

There is nothing peculiar or special about it. On the contrary[,] it is a usual, common and anticipatable danger in the routine performance of the work, against which the owner is not required to take special precautions. [Citation.] If this type of risk were held to be a special or peculiar risk within the meaning of the doctrine, then one would be hard put to imagine any type of negligence of the contractor or his employees for which the owner could not be held liable[.] [W]e do not think it was the intention of either the authors of the Restatement or the Supreme Court to entirely eliminate the insulation of the owner from liability for acts of an independent contractor." (*Id.,* at p. 972.)

Like *Stark,* in the case at bench, the subcontractor, Steelform, supplied the plywood and supporting members to employees, including plaintiff. ██ *Stark* cites *Holman* v. *State of California* (1975) 53 Cal.App.3d 317, 330 [124 Cal.Rptr. 773], which "held that '. . . an owner is not liable for injuries resulting from defective equipment [or improperly constructed concrete forms] used by the subcontractor unless the owner supplied the equipment or had the privilege of selecting it or the materials out of which it is made, or unless he exercised active control over the operations of the equipment. [Citation.]' We explained that under those circumstances 'the injury is caused by a risk apart from the work itself [grading and surfacing the highway]. . . .' The stated principle applies to [the forms] supplied by the contractor with special force and validity. It would be entirely impracticable, unreasonable and expensive to expect a [general contractor] to set up a system to monitor the manner in which [the component parts selected and assembled] are used by workmen and guard against misuse or negligent use of [such items] by workmen in day-to-day operations on the job. [Citations.]" (*Stark* v. *Weeks Real Estate, supra,* 94 Cal.App.3d 965, 973.)

██ In the case at bench, the circumstances showed only the subcontractor Steelform's routine negligence, rather than plaintiff's participation in work to which peculiar risk attached. Thus the trial court correctly granted nonsuit on the applicability of the peculiar risk doctrine, refusing to instruct on the issue, and requesting the special verdict by the jury. We find no error.

## II.

██ Plaintiff contends that the trial court erroneously denied plaintiff's motion to render the Workers' Compensation Appeals Board's (Board) findings res judicata in the case at bench.

In 1984 the Board upheld an award to plaintiff against his employer, Steelform; found a permanent disability of 58-1/2 percent; and imposed the

maximum penalty of $10,000 upon Steelform because of Steelform's serious and willful misconduct in failing to provide a safe place to work.

The res judicata doctrine gives conclusive effect to a former judgment in subsequent litigation involving the same controversy. For a judgment in one tribunal to be res judicata in a later proceeding, both tribunals must decide the indentical issue; the earlier tribunal must have rendered a final judgment on the merits; and the party against whom the res judicata plea is asserted must have been a party, or in privity with a party, to the earlier proceeding. (*In re Marriage of Modnick* (1983) 33 Cal.3d 897, 904 [191 Cal.Rptr. 629, 663 P.2d 187]; *Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 813 [122 P.2d 892].)

A workers' compensation judgment can have res judicata effect if it meets all the doctrine's other essential elements. (*Unruh* v. *Truck Insurance Exchange* (1972) 7 Cal.3d 616, 633 [102 Cal.Rptr. 815, 498 P.2d 1063].) The res judicata plea in the case at bench, however, satisfies none of these three requirements.

First, plaintiff sought to have the Board findings be conclusive as to Steelform's failure to take reasonable precautions for the safety of the job site. It is true that the Board is a constitutional court in California, and that its decisions may thus on occasion be given conclusive effect. (7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 208, p. 644, and cases there cited.) The res judicata doctrine, however, does not apply when the "former judgment" is not final. Since Board decisions may be rescinded or amended for a five-year period, they are not final for res judicata purposes until that period has elapsed. The Board's decision upholding plaintiff's award in his suit against Steelform was made in 1984, and is not yet final.

Second, the defendant in the case at bench was not a party to the Board proceeding. Res judicata " ' "rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, or had opportunity to litigate the same matter in a formal action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harrassment and vexation of his opponent." ' " (*Palma* v. *U. S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 182 [203 Cal.Rptr. 626, 681 P.2d 893], quoting *Panos* v. *Western Packing Co.* (1943) 21 Cal.2d 636, 637 [134 P.2d 242].)

In the case at bench, by contrast, the plaintiff pleads the res judicata doctrine to bar this defendant, not present before the Board proceeding, from litigating for the first time. "Although one who was neither a

party nor in privity with a party to a previous action may assert the plea of collateral estoppel against a party or one in privity with a party to the prior adjudication [citation], the party *against whom* the plea of . . . res judicata is asserted *must* have been a party or otherwise privy to the prior action." (*F. W. Woolworth Co.* v. *Franchise Tax Bd.* (1984) 160 Cal.App.3d 1154, 1160 [207 Cal.Rptr. 149]; italics original.)

Moreover, since a workers' compensation proceeding gives an employer no right to a jury trial, were it applied in the case at bench, the res judicata doctrine would deny the defendant its constitutional right concerning a key issue upon which liability turns. (*Kelly* v. *Trans Globe Travel Bureau, Inc.* (1976) 60 Cal.App.3d 195, 202 [131 Cal.App.3d 488], citing Cal. Const. art. I, § 7, and *Beacon Theatres* v. *Westover* (1959) 359 U.S. 500 [3 L.Ed.2d 988, 79 S.Ct. 948].)

Third, the issues presented in the workers' compensation proceeding differ appreciably from the issues to be determined by the trial court in adjudicating the applicability of the "peculiar risk" doctrine upon a motion for nonsuit. We therefore find no error.

## III.

Plaintiff contends that the trial court erred in denying plaintiff's motion to quash the assignment of the lien of plaintiff-in-intervention to defendant general contractor. Plaintiff claims that the assignment should be adjudged invalid because it assertedly in effect skirts the rule precluding a tortfeasor from the benefits accruing from his own wrong. (See, e.g., *Witt* v. *Jackson* (1961) 57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641].) In view of our disposition of this appeal, it is unnecessary for us to resolve an issue which has thereby been rendered moot.

### DISPOSITION

The judgment is affirmed.

Lucas, J., and Devich, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 2, 1987. Mosk, J., was of the opinion that the petition should be granted.

## APPENDIX A

PLAINTIFF'S EXHIBIT NO. W-1

DEFENDANT'S EXHIBIT NO. W-4

## APPENDIX B

DETAIL