Filed 8/5/25  Healy v. Coachella Management Partners CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| PATRICIA HEALY et al.,<br><br>      Plaintiffs and Respondents,<br><br>v.<br><br>COACHELLA MANAGEMENT PARTNERS, LLC, et al.,<br><br>      Defendants and Appellants. | B330394<br><br>(Los Angeles County<br>Super. Ct. No. BC633340) |
| HAILEE ERIKSON,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>COACHELLA MANAGEMENT PARTNERS, LLC, et al.,<br><br>      Defendants and Appellants. | B332515<br><br>(Los Angeles County<br>Super. Ct. No. BC633940) |

APPEALS from a judgment of the Superior Court of Los Angeles County, Frank M. Tavelman, Judge. Affirmed.

Gilmore Magness Janisse, GM Legal and David M. Gilmore for Defendants and Appellants.

Abir Cohen Treyzon Salo, Boris Treyzon and Brianna Y. Franco for Plaintiffs and Respondents Juan Godinez and Andrea Lui.

Good Gustafson Aumais, Christopher T. Aumais and Christina W. Kim for Plaintiff and Respondent Sarah McLean.

Johnston & Hutchinson, Thomas J. Johnston; The Kneafsey Firm, Sean M. Kneafsey and Matthew C. Carter for Plaintiff and Respondent Patricia Healy.

———————————————

Defendants Coachella Management Partners, LLC (Coachella) and Alexis M. Gevorgian appeal from a judgment after trial. In 2015, defendants hired a contractor to remove a dry and brittle wooden structure from their property. In the demolition process, sparks from the subcontractor's workers' tools ignited a fire, which burned down the structure and a neighboring apartment building.

Plaintiffs Juan Godinez, Andrea Lui, Sarah McLean, and Patricia Healy were residents of the neighboring building. They sued defendants for damages. Liability issues were tried to the court. The trial court found Coachella liable for negligence on a peculiar risk theory and, in a second phase of the proceeding, concluded Gevorgian was liable as Coachella's alter ego.

Defendants contend the trial court's finding of liability under the peculiar risk doctrine violated Coachella's due process rights and is not supported by substantial evidence. They further

2

argue that substantial evidence does not support the trial court's alter ego finding, the remedy the trial court fashioned was improper, and the court had no personal jurisdiction over Gevorgian as to plaintiff Patricia Healy's complaint. We find no error in the trial court's rulings and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Gevorgian is the sole member of Coachella and the trustee of AMG & Associates Retirement Trust. In 2015, Coachella acquired a property in North Hollywood at a foreclosure sale. At that time, there was "an abandoned multistory, multiunit" wooden structure that had been on the property for several years and, due to exposure, had become "very dry and rotted." As one plaintiff described it at trial, the structure "was old, dry, gray, bare, and it looked like kindling."

Gevorgian retained a contractor, Silver Star Construction Engineering, Inc. (Silver Star Construction), to demolish the structure. The contractor, in turn, retained a subcontractor, Prime Contractors, Inc. (Prime Contractors). At trial, Gevorgian testified that he understood the "standard practice" for a demolition involved the use of "heavy equipment," such as a bulldozer, to "level" the property and foundation and then haul the debris off-site. In June 2015, while working on the demolition, the subcontractor's workers used hand-held power tools. Sparks from the tools ignited the wooden structure. The fire spread to the apartment building, adjacent to the property, where plaintiffs lived. The apartment building ultimately burned down.

3

In September 2016, residents from the apartment building filed lawsuits. Plaintiffs Hailee Erikson,[1] Godinez, Lui, and McLean filed a complaint asserting causes of action for negligence and negligent hiring, training, and retention against Coachella, Gevorgian, Silver Star Construction, and another entity (the Erikson action). The same month, plaintiff Healy filed a separate action naming as defendants another entity and two of Gevorgian's companies, AMG & Associates, LLC and AMG Investment and Development Services, Inc. (the AMG entities). (*Healy v. Paglia & Assoc. Construction Inc., et al.*, Los Angeles Superior Court, No. BC633940.) In October 2016, Healy filed a first amended complaint (FAC) asserting a single cause of action for negligence against Silver Star Construction, Prime Contractors, and the AMG entities. She later filed an amendment to substitute Coachella as a Doe defendant.

In 2017, the Healy and Erikson matters were deemed related. In January 2018, the parties stipulated to consolidate the two cases "for all purposes." The trial court consolidated the cases and designated the Erikson action as the lead case.

In May 2019, Silver Star Construction and Prime Contractors settled with plaintiffs and were dismissed from the action. The matter proceeded to trial against Coachella, Gevorgian, and the AMG entities. In the first phase, the court held a bench trial on the issue of each defendant's liability (Phase I).[2] The court found only Coachella liable for negligence, applying the peculiar risk doctrine. The case proceeded to a second bench

---

[1]     Erikson is not a party to the appeal.

[2]     All plaintiffs dismissed the AMG entities at the end of Phase I.

4

trial on the allegation that Gevorgian was liable as Coachella's alter ego (Phase II). The third and final phase was a jury trial on the amount of damages (Phase III).

Defendants timely appealed from an initial judgment. The trial court subsequently issued a second amended judgment after a hearing on the parties' post-trial motions. Defendants timely appealed from the amended judgment as well. We granted a motion to consolidate the appeals.

## DISCUSSION

## I. The Trial Court Did Not Err in Finding Coachella Liable for Negligence

The trial court issued a statement of decision finding that plaintiffs met their burden of proving Coachella's liability under the peculiar risk doctrine. The court found the evidence at trial established that "Coachella should have recognized the work posed a peculiar risk of fire" and failed to take "additional safeguards" to mitigate the risk. It further concluded the negligence was "directly related to the peculiar risk inherent in dismantling a tinder-like wooded structure."

Defendants contend the trial court's reliance on the peculiar risk doctrine deprived them of due process because the theory was "not pleaded or presented" during the bench trial. Defendants also contend insufficient evidence supported the trial court's application of the peculiar risk doctrine. We reject both arguments.

### A. Relevant background

In the Erikson action, plaintiffs alleged that defendants breached their duty of care by allowing the structure to dry out and to be dismantled with power tools in excessive heat. They specifically alleged defendants knew or should have known that

5

the contractors would use power tools to dismantle the structure. Healy alleged that defendants "negligently maintained, controlled, operated[,] and supervised the construction site" and "fail[ed] to use reasonable care to keep the construction site reasonably safe from" fire hazards.

In the first liability phase of the proceedings, plaintiffs called Jeff Hughes as an expert witness. Hughes was a senior construction manager with experience as a licensed general contractor and subcontractor, a safety-trained supervisor of construction, and a fire and smoke damage consultant. Hughes was retained to evaluate how the demolition was completed. Hughes testified that based on his review of aerial photographs on Google Earth, he observed that the incomplete wooden structure on the property was about 10 feet from plaintiffs' apartment building. It had been exposed to the elements since 2009. Hughes opined that "the building was overexposed to the elements for a lengthy period of time, which made the building unsafe . . . structurally. [¶] It was a hazard in terms of . . . the wood and the fasteners being subjected to so many months of wind, rain, solar exposure that rendered the building . . . like tinder." He further opined that "the owner and their agent had failed to properly protect the building and the construction project relative to the subject defendants' building, which caused the fire . . . ."

Plaintiffs also offered the testimony of Corey Rose, an Assistant Chief with the Los Angeles Fire Department. Rose responded to the fire on the property. He had personally seen the wooden structure on the property for "five or six years" before the fire. He testified that the structure posed an "extreme fire hazard" because there was "an exposure of dry wood" left

6

unattended without a fire alarm system, sprinkler system, or any other precautionary measures. Rose testified that the fire generated "a tremendous amount of heat . . . because of the dryness of the wood."

In the defense case, Gevorgian testified that when Coachella bought the property in 2015, he observed that the wood on the structure was "weathered." He entered an agreement with the contractor "to strictly demolish the [structure] as well as the foundations." Gevorgian discussed the scope of the work to be performed with the contractor more than twice. Gevorgian was aware the structure had been abandoned on the property, but he and the contractor did not specifically discuss hiring a fire prevention superintendent.

Gevorgian believed that to perform a demolition, the contractor would use bulldozers, backhoes, and other "heavy equipment" to tear down the building, excavate the foundations, and haul away the debris. He did not hire the contractor "to bring on equipment that would be used to create sparks and flammable situations . . . ." When asked if he put those considerations into the written agreement with the contractor, Gevorgian responded that he did not recall the contractual terms but he had used "a typical contract that we've used in numerous demolitions." The agreement required that the contractor perform the work "in a substantial workman-like manner." Gevorgian "did not tell [the contractor] how to do the work," provide any equipment, or deal with the subcontractor.

In a joint trial brief and during closing argument, plaintiffs argued that the defendants' decision to demolish the structure constituted an ultrahazardous activity; defendants breached their nondelegable duty to maintain the buildings in a reasonably safe

7

condition; defendants were liable under a negligence per se theory because they failed to comply with numerous fire and building codes that required them to take certain fire precautions; defendants were directly negligent by failing to maintain the property in a reasonably safe condition; and defendants were liable under the theory of res ipsa loquitur. In its statement of decision, the trial court found the evidence established that absent special precautions, the demolition of a "tinder-like wooded structure" created a peculiar risk of fire known to Coachella. The court further concluded Coachella had not taken sufficient steps to mitigate the risk. Thus, the court ruled plaintiffs met their burden to show Coachella was liable for plaintiffs' harm.

### B. The Peculiar Risk Doctrine

"At common law, a person who hired an independent contractor generally was not liable to third parties for injuries caused by the contractor's negligence in performing the work." (*Privette v. Superior Court* (1993) 5 Cal.4th 689, 693 (*Privette*).) An exception to this rule "pertains to contracted work that poses some inherent risk of injury to others. This exception is commonly referred to as the doctrine of peculiar risk." (*Ibid.*) "Under the peculiar risk doctrine, a person who hires an independent contractor to perform work that is inherently dangerous can be held liable for tort damages when the contractor's negligent performance of the work causes injuries to others." (*Id.* at p. 691; *Tverberg v. Fillner Construction, Inc.* (2010) 49 Cal.4th 518, 524 (*Tverberg*).)

"The analysis of the applicability of the peculiar risk doctrine to a particular fact situation can be broken down into two elements: (1) whether the work is likely to create a peculiar

risk of harm unless special precautions are taken; and (2) whether the employer should have recognized that the work was likely to create such a risk." (*Jimenez v. Pacific Western Construction Co.* (1986) 185 Cal.App.3d 102, 110 (*Jimenez*).)

A peculiar risk "is a special or recognizable danger inherent in the work itself, and that arises 'either from the nature or the location of the work . . . .' " (*Tverberg, supra*, 49 Cal.4th at p. 524; Rest.2d Torts, § 413, com. b [peculiar risks arise from work's "character, or out of the place where it is to be done," including risks that are "a special danger to those in the vicinity, arising out of the particular situation created"].) "[A]n activity poses a peculiar risk when, if reasonable care is not taken, the resulting risk differs from the types of risk that are usual in the community." (Rest.3d Torts, § 59, com. b.) The inquiry focuses "on whether the risks of the activity are different from ordinary risks." (*Ibid*.)

The peculiar risk doctrine imposes liability on the hirer of a contractor "although the [hirer] at the time he lets the contract has no reason to anticipate that conditions will arise which require special precautions to be taken, if in fact such conditions do arise and he knows or should know of them." (*MacKey v. Campbell Construction Co.* (1980) 101 Cal.App.3d 774, 784 (*MacKey*), citing Rest.2d Torts, § 413, coms. b, f; Rest.3d Torts, § 59, com. e.) A hirer is required to take precautions that reasonable care requires given the nature of a known peculiar risk posed by the activity. (Rest.3d Torts, § 59, reporter's notes.)

"Whether the particular work which the independent contractor has been hired to perform is likely to create a peculiar risk of harm to others unless special precautions are taken is ordinarily a question of fact." (*Castro v. State of California* (1981)

9

114 Cal.App.3d 503, 511; *MacKey*, *supra*, 101 Cal.App.3d at p. 785 [whether work likely creates peculiar risk "ordinarily a question to be resolved by the trier of fact"].)

## C. The trial court's ruling did not violate defendants' due process rights

Defendants contend their due process rights were violated because plaintiffs did not assert the peculiar risk doctrine as a basis for negligence in their pleadings; neither party presented evidence regarding the theory during trial; and the trial court did not advise the parties that it was considering the theory before it issued its statement of decision.

"Due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (*Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 543.) "Fairness dictates that a complaint give the defendant sufficient notice of the cause of action stated to be able to prepare the case." (*Leek v. Cooper* (2011) 194 Cal.App.4th 399, 413 (*Leek*).) Additionally, all parties must be afforded the opportunity to be heard if the trial court "*sua sponte*, unearths a point of law which it deems to be decisive of the cause . . . ." (*Moore v. California Minerals Products Corp.* (1953) 115 Cal.App.2d 834, 837.)

Here, due process principles did not require plaintiffs to identify the peculiar risk doctrine in their complaints as the specific theory of liability underpinning their negligence cause of action. "That the issues were not pleaded does not preclude their adjudication where a case is tried on the merits, as here, the issues thoroughly explored during trial, and the theory of the trial well known to court and counsel. [Citation.] Moreover, a shifting from one theory of liability to another is not the

10

substitution of a new cause of action when the basic facts are the same." (*Bruckman v. Parliament Escrow Corp.* (1987) 190 Cal.App.3d 1051, 1060 [no need to conform pleading to proof where same basic facts underlie different theories of liability under contract and tort].)

These requirements were met in this case. The facts plaintiffs asserted in support of their respective causes of action for negligence, and in subsequent motions, briefs, and oral arguments, encompassed facts relevant to a peculiar risk theory of liability. For instance, plaintiffs consistently took the position that the structure posed a fire risk because of its extended exposure to the elements, and that Coachella had failed to take necessary and special precautions to protect others against the hazard it knew or should have known existed on its property.

These facts were thoroughly adjudicated at trial. Witnesses Hughes and Rose testified to the condition of the wooden structure and the existence of precautionary measures defendants could have taken to abate the risk of fire. Counsel questioned Gevorgian at length about his knowledge of the hazard and his efforts to implement special precautions.

Moreover, the peculiar risk doctrine was brought before the court and indirectly argued as defendants relied on "the doctrine of collateral negligence," an *exception* to liability based on the peculiar risk doctrine. Defendants' trial brief argued that the collateral negligence doctrine precluded a finding of liability because the independent contractor's negligence in the manner of performing the work created the risk of harm that was not inherent to the work and not foreseeable by defendants. In the three cases the brief cited in support of the argument, each expressly identified collateral negligence as a consideration in

11

determining whether a party was liable under a theory of peculiar risk. (*Van Arsdale v. Hollinger* (1968) 68 Cal.2d 245, 253–254 [collateral negligence is exception to nondelegable duty; peculiar risk is type of nondelegable duty]; *LaCount v. Hensel Phelps Constr. Co.* (1978) 79 Cal.App.3d 754, 765 [discussing " 'collateral' negligence exception to the peculiar risk doctrine"]; *Smith v. Lucky Stores* (1976) 61 Cal.App.3d 826, 829–831 [collateral negligence unrelated to peculiar risk does not justify imposition of liability on employer of independent contractor].)

Critically, in his closing argument, defense counsel expressly identified the peculiar risk doctrine as an exception to the rule that a hirer may not be held liable for the tort of a contractor and argued against its application to this case. He argued: "Only under the peculiar risk doctrine can the property owner be held liable for the work of an independent contractor. [¶] However, that has an exception. And that exception is that [the] peculiar risk doctrine does not attach if the harm was caused by [an] unforeseeable deviation from the plan of work, which is exactly what happened here." Echoing defendants' trial brief, defense counsel argued the subcontractor's "misuse" of power tools to salvage materials was an act of "collateral negligence" that fell outside the scope of peculiar risk liability.

The record indicates defendants understood plaintiffs' allegations to encompass the peculiar risk doctrine and they responded accordingly. We therefore find no basis to conclude that any due process violation occurred.

12

**D.    Substantial evidence supported the trial court's finding of liability under the peculiar risk doctrine**

We further conclude that substantial evidence supported the trial court's conclusion that Coachella was liable under the peculiar risk doctrine.

The evidence adduced at trial showed that the wooden structure posed a peculiar risk of fire known to Coachella. Hughes and Rose testified that due to years-long exposure, the wooden structure was "like tinder" and an "extreme fire hazard." Gevorgian himself was aware the structure had been abandoned on the lot many years before and that its wood was "weathered." The record also supported a finding that, despite this knowledge, Coachella did not take any precautions to mitigate the risk of fire. Gevorgian's discussions with the contractor did not identify the wooden structure as a fire hazard. The written agreement he signed with the contractor also did not address the risk of fire posed by the structure or measures the contractor should take to prevent or mitigate the risk. (*Jimenez, supra*, 185 Cal.App.3d at p. 109 [Rest.2d Torts, § 413 imposes liability on hirer "when he has made no provision in the contract or otherwise for the taking of required precautions"].)

Defendants contend there was no basis to find Coachella liable under the peculiar risk doctrine because the demolition was an ordinary act, the risk of fire and attendant precautions were not peculiar, and the fire resulted from the subcontractor's collateral negligence in using power tools to perform a salvage instead of a demolition. We disagree.

To the extent defendants focus on the "ordinary" nature of the demolition to support their position, they misconstrue the

13

inquiry under the peculiar risk doctrine. The question is not whether demolition in general posed a peculiar risk of harm. Instead, the inquiry is whether demolition of an excessively dry, weathered structure posed a peculiar risk of fire. (See Rest.2d Torts, § 413, com. b ["character" of work and "particular situation" relevant to determination of peculiar risk].)

Similarly unpersuasive is defendants' contention that "the risk of fire is always present" and the fire prevention measures were "normal precautions" that the contractor and subcontractor could have reasonably been expected to take. Defendants' argument ignores evidence establishing that the wooden structure presented an "extreme fire hazard," over and above the standard risk of fire, at the time of the demolition. This required Coachella to take precautions to abate that specific, elevated risk. That an ordinary risk of fire is always present, and routine fire safety measures exist to address it, does not affect this conclusion. (*Griesel v. Dart Industries, Inc.* (1979) 23 Cal.3d 578, 587 ["The fact that an activity involves an ordinary and customary danger of the particular work to be performed is immaterial to the question of whether it may involve a peculiar risk of harm within the meaning of the peculiar risk doctrine."].)

Defendants next contend that the trial court improperly held Coachella liable because the risk of fire was not a peculiar risk arising from the demolition defendants hired the contractor to perform. Defendants argue that the harm resulted from an "operative detail"—namely, the subcontractor's decision to use hand-held power tools—and defendants were unaware the subcontractors' workers would use such tools to perform a demolition. According to defendants, the risk of fire was a customary, ordinary risk arising from the negligent,

14

unanticipated method the subcontractor employed to complete the work.  We disagree.

"[T]he peculiar risk is one which is peculiar to the work to be done and arises out of its character and the place where it is to be done and is something other than an ordinary and customary danger which may arise in the course of the work or of normal human activity.  It has reference only to a special, recognizable danger arising out of the work itself." (*Stark v. Weeks Real Estate* (1979) 94 Cal.App.3d 965, 971 (*Stark*).)  For a risk to be peculiar, " '[i]t must involve some special hazard resulting from the nature of the work done, which calls for special precautions.' " (*Id*. at p. 972, quoting Rest.2d Torts, § 416, com. d.)

Here, the fire was the result of sparks from power tools igniting the tinder-like structure on defendants' property.  While it is undisputed that the tools caused the spark, the structure provided the kindling.  The risk of fire was therefore inherent to demolition work performed on the exceedingly dry, weathered structure on defendants' property.  It was reasonable to conclude the fire hazard posed by the structure was a recognizable risk that defendants should have taken special precautions to abate. (See *McDonald v. City of Oakland* (1965) 233 Cal.App.2d 672, 673–676 [hirer liable for failing to provide adequate ventilation as precaution against recognizable risk of explosion caused by painting inside of a tank with combustible substance]; see also *Walker v. Capistrano Saddle Club* (1970) 12 Cal.App.3d 894, 898 [hirer liable for failing to take special precautions against risk of

15

harm posed by high voltage wires he knew spanned bridge where contractor's crane was operating].)[3]

Defendants' reliance on *Hughes v. Atlantic Pacific Construction Co.* (1987) 194 Cal.App.3d 987 (*Hughes*), is misplaced. In *Hughes*, the court rejected the peculiar risk doctrine as a basis to hold a hirer liable for injuries sustained by a subcontractor's employee when he fell after a panel of plywood placed between two beams of a building gave way when he stepped on it. (*Id.* at pp. 992–993, 999.) The court concluded that the subcontractor's "[n]egligent selection of pieces of plywood" that were too small and improperly secured was "routine negligence" and not negligence related to a peculiar risk inherent to the work. (*Id.* at p. 1000; see also *Stark, supra,* 94 Cal.App.3d at p. 972 [risk of harm caused by negligent use of hand tools by contractor's employee was not peculiar risk against which hirer had to take special precautions].)

In contrast to *Hughes*, the evidence here showed that the structure was highly flammable at the time of demolition due to its prolonged exposure to the elements. The condition of the structure and the excessive heat created an uncommon risk of

---

[3]     These cases found hirers liable under the peculiar risk doctrine for harm suffered by the employees of independent contractors. The Supreme Court subsequently held that an employee of an independent contractor could not recover under the peculiar risk doctrine against the hirer of the independent contractor. (*Privette, supra,* 5 Cal.4th at p. 701.) However, *Privette* did not limit the doctrine's application to hold hirers liable for harm to *third parties* caused by a contractor's negligence. (*Ibid.* ["original form" of peculiar risk doctrine makes hirers liable for "injuries to an innocent bystander or an owner of neighboring land" caused by actions of contractor].)

fire.  It was therefore reasonable to conclude the risk of fire was the type against which defendants were required to take special precautions, and not simply one arising from the subcontractor's " 'collateral' or 'casual' negligence" in the performance of an operative detail of the work.  (*Hughes*, *supra*, 194 Cal.App.3d at p. 1000; *Stark*, *supra*, 94 Cal.App.3d at p. 972.)

## II.  Alter Ego Liability

Defendants also challenge the trial court's ruling finding Gevorgian liable as the alter ego of Coachella.  They contend substantial evidence did not support the ruling and the court erred by allowing Gevorgian the option to recapitalize Coachella before being named as a judgment debtor.  Further, defendants argue that the trial court had no personal jurisdiction over Gevorgian.  We reject these arguments.

### A.  Substantial evidence supported the trial court's finding of alter ego liability

#### 1.  Gevorgian's testimony at trial

Gevorgian is Coachella's manager and sole member.  Gevorgian made a capital contribution of $1,000 in 2012 and made additional contributions as needed.  The operating agreement required Gevorgian to execute a written consent and revise a schedule to the agreement when making additional capital contributions.  Gevorgian could not recall if he ever did so.

The fire took place in June 2015.  In 2015 and 2016, Gevorgian took several distributions from Coachella: $39,000 in April 2015; $739,064.27 in July 2015; $312,940 in August 2015; $30,000 in August 2015; $618,024.28 in November 2015; $30,170.64 in November 2015; $1 million in January 2016; $50,000 in February 2016; $2,000 in March 2016; $230,000 in February 2017; $350,000 in March 2017; and $648,194.92 in

17

March 2017.  Gevorgian did not recall the specific reason for taking each distribution, but testified that the withdrawals were "probably," or "could have been" for the "return of capital, return of costs, reimbursements."  Gevorgian testified that he had loaned money to Coachella to pay "the cost of the land purchase, costs of the entitlements, bank fees, legal fees for the litigation," and other "project costs," and for services provided by third parties, such as consulting work.  He testified that generally, he only documented loans made by third-party lenders.  He could not recall if he documented the loans he personally made to Coachella.

Coachella's operating agreement allowed distributions to members "[s]ubject to the payment of all third party and related party debt obligations . . . ."  Gevorgian initially testified that he was not sure if this prohibited him from causing Coachella to make distributions if there were outstanding liabilities.  He explained that in general, he relied only on his "judgment call" about whether he could take a distribution.  Subsequently, Gevorgian agreed that the operating agreement required all debts and obligations to be paid before a distribution was made, but he could not recall if he had complied with that requirement before making the distributions in 2015 and 2016.

Gevorgian testified that after the fire, he "knew that there would presumably be some claims for the damages," but he did not anticipate any claims would be made against Coachella.  He later testified that he made an "assessment" that the damage from the fire "would probably be less than $400,000 or so."  He believed Coachella was insured "through" the policies of the general contractor and subcontractor and that these policies would cover the damages from the fire.  Gevorgian could not

18

recall if the insurance company had offered to defend him in the lawsuit or indemnify him for any damages he incurred.

The court admitted bank records reflecting that as of March 2017, the balance of Coachella's bank account was $0. Gevorgian did not know how Coachella was paying its legal fees or its franchise fee to the state. When asked how Coachella would pay damages now that it had been found liable, Gevorgian testified that "the only way to address the liability would be to raise capital or to get a loan." He testified that although he was aware of the damage caused by the fire and that multiple parties were harmed, he did not reserve any assets in Coachella's account to pay potential liabilities. According to Gevorgian, as of the date of his testimony, Coachella was still operating, but he had not "acquired any new opportunities through" Coachella since the fire, although he had used other entities in "dozens of land transactions" since that time.

The court found plaintiffs met their burden to hold Gevorgian liable as the alter ego of Coachella. Specifically, the court found the evidence showed Gevorgian "operated [Coachella] in such a manner, including but not limited to the removal of all assets with the knowledge of pending liabilities, such that liability protection would be inequitable."[4]

---

[4] The court issued its original ruling on the alter ego issue in August 2022. In February 2023, the trial court issued a revised ruling correcting a grammatical error and noting defendants had objected to the original ruling on the basis that Gevorgian was not a party to the lawsuit. The revised ruling overruled the objection and was otherwise substantively the same as the court's original ruling.

19

## 2.     Applicable legal principles

Alter ego liability applies where evidence establishes " ' "such a unity of interest and ownership" ' " between a corporation and an individual that it justifies the court's disregard of the corporate entity, and where doing so would prevent the use of the separate corporate entity to " ' "sanction a fraud or promote injustice." ' [Citations.]" (*Associated Vendors, Inc., v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 837 (*Associated Vendors*).)  A party seeking to establish alter ego liability must therefore show "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.  [Citations.]  With respect to the second requirement, it is sufficient that it appear that recognition of the acts as those of a corporation only will produce inequitable results." (*Ibid.*)  "[B]oth of these requirements must be found to exist before the corporate existence will be disregarded . . . ." (*Ibid.*, italics omitted.)

The alter ego test requires courts to consider a myriad of factors.  (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 812 (*Zoran*).)  These factors include, among others: commingling of assets; an individual's treatment of corporate assets as his own; the failure to maintain adequate corporate records; sole ownership of all stock by one individual; inadequate capitalization, undercapitalization, or the total absence of corporate assets; disregard of legal formalities; the diversion of corporate assets to stockholders to the detriment of creditors; and the entity's or the individual's use of the corporate entity as a shell or conduit.  (*Id.* at pp. 811–812; *Sonora Diamond Corp. v.*

20

*Superior Court* (2000) 83 Cal.App.4th 523, 539 (*Sonora*).)
Additionally, "[t]here also must be some conduct amounting to
bad faith that makes it inequitable for [the defendant] to hide
behind the corporate form." (*Leek, supra*, 194 Cal.App.4th at
p. 418.)

No single factor is determinative, and courts "must look at
all the circumstances to determine whether the doctrine should
be applied." (*Sonora, supra*, 83 Cal.App.4th at p. 539; *Zoran,
supra*, 185 Cal.App.4th at p. 812.) Whether both prongs of the
alter ego test are met "is primarily one for the trial court and is
not a question of law . . . the conclusion of the trier of fact will not
be disturbed if it [is] supported by substantial evidence."
(*Associated Vendors, supra*, 210 Cal.App.2d at p. 837; *Las Palmas
Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d
1220, 1248 [because alter ego is equitable, application does not
depend on prior decisions concerning similar facts].)

That the trial court did not expressly discuss various
factors in its ruling does not warrant reversal where, as here,
defendants did not request a statement of decision from the court
and therefore did not ask the court to make specific findings.[5]
Further, defendants' citation to uncontradicted testimony in
support of their arguments " 'does not necessarily conclusively
establish the pertinent factual matter: The trier of fact is free to
*reject any witness*' uncontradicted testimony; and the court of

---

[5] Defendants refer to a statement of decision on alter ego
liability in their opening brief. However, the record does not
indicate that either party requested a statement of decision on
this issue before entry of judgment. (See Code Civ. Proc., § 632
[for one-day trial, parties must request a statement of decision
before the submission of the matter for decision]; Cal. Rules of
Court, rule 3.1590(n).)

appeal will affirm so long as the rejection was not arbitrary.' [Citations.]" (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 368; *Ortzman v. Van Der Waal* (1952) 114 Cal.App.2d 167, 171.) Accordingly, we "presume that the trial court made all factual findings necessary to support the judgment . . . and the only issue on appeal is whether the implied findings are supported by substantial evidence." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267; see *JPV I L.P. v. Koetting* (2023) 88 Cal.App.5th 172, 196–197 [presuming trial court considered all circumstances relevant to alter ego inquiry in statement of findings].)

### 3.    Discussion

Substantial evidence supported the trial court's conclusion that Gevorgian was the alter ego of Coachella.

Gevorgian's testimony established that Gevorgian and Coachella were not distinct personalities. Gevorgian was Coachella's sole owner and member, and he made all management decisions. He could not recall adhering to corporate formalities to document his capital contributions. After the fire, he used his authority as the sole shareholder to disburse Coachella's assets to himself. Gevorgian took distributions from Coachella totaling more than $4 million, over $1.2 million of which was disbursed after plaintiffs filed their respective complaints naming Gevorgian or his businesses as defendants. Gevorgian could not provide his reasons for the distributions. He could not recall whether he ensured all existing debts and obligations were paid before making the distributions, as required by the operating agreement.

Further, it is undisputed that Gevorgian's distributions left Coachella not just undercapitalized, but with no assets at all.

22

Coachella had no insurance. Gevorgian's claim that he believed the contractors' insurance policies would cover Coachella's liability was entirely uncorroborated. Although Gevorgian had assessed the extent of the damage caused by the fire, and no evidence indicates he confirmed whether Coachella would be covered by others' insurance policies, Gevorgian continued to whittle Coachella's bank balance to $0 in the years following the fire. He did not invest any further funds in the entity, leaving it with no capital to pay any potential judgment stemming from the incident.

This evidence, and the reasonable inferences which may be drawn from it, supports the conclusion that Gevorgian dominated and controlled Coachella and diverted the entity's assets for his own uses, to the detriment of creditors. This was sufficient to establish both prongs of alter ego liability. (See *Alexander v. Abbey of the Chimes* (1980) 104 Cal.App.3d 39, 47 [entity that agreed to sell all assets to another corporation while litigation was pending, leaving it "a hollow shell without means to satisfy its existing and potential creditors," was "more than sufficient" to hold sole stockholder liable as alter ego]; see *id*. at p. 43.)

Defendants contend the evidence showed only that Coachella lacked adequate capital to pay plaintiffs' damages, which was an insufficient basis to impose alter ego liability.[6] The record does not support this characterization of the evidence. The evidence adduced at trial did not simply show that Coachella

---

[6] Defendants also appear to argue that the proper inquiry was whether Coachella was adequately capitalized at the time it was created. Defendants cite no authority for this proposition, and we do not address it. (*Dabney v. Dabney* (2002) 104 Cal.App.4th 379, 384.)

could not satisfy creditors such as plaintiffs. Rather, the trial court could reasonably consider the evidence reflecting the timing and frequency of Gevorgian's distributions, his inability to recall his reasons for the distributions, his failure to recall whether he complied with corporate formalities, his failure to maintain records of his transactions with Coachella and the absence of any documentary evidence that he did so, the depletion of Coachella's assets, and the absence of insurance coverage, to conclude that there was a unity of interest and ownership between Gevorgian and Coachella and he deliberately depleted Coachella's assets to avoid paying out claims arising from the fire.

Defendants' remaining arguments are also unavailing. The absence of evidence of specific factors, such as commingled funds or the personal use of business resources, does not alter the conclusion. As stated above, the existence or absence of specific factors is not determinative of alter ego liability, and we reach our conclusion based on the totality of the circumstances. (*Zoran*, *supra*, 185 Cal.App.4th at p. 812; *Sonora*, *supra*, 83 Cal.App.4th at p. 539.)

### B. The trial court's alter ego remedy was not reversible error

#### 1. Background

In its ruling finding Gevorgian liable as Coachella's alter ego, the trial court noted that Gevorgian testified he may be able to recapitalize Coachella to pay damages owed. On this basis, the court ordered that "any alter-ego / 'piercing the corporate veil' would only occur if [Coachella] does not have sufficient assets to justify any dollar damages that may be awarded in Phase III." The trial court's initial judgment in February 2023 reflected this ruling.

24

In March 2023, defendants moved for a new trial challenging this remedy.  At the hearing on the motion, the court explained that its ruling intended to afford Gevorgian an opportunity to fund Coachella "through a loan or some other means to avoid the judgment against him," but allowed plaintiffs to amend the judgment to name him as a defendant if Coachella could not satisfy the claims.  The court stated: "[T]he law says you could amend the judgment.  Based on alter ego.  [¶]  All I'm doing is discussing options under the law.  I'm not creating something new that doesn't otherwise exist."

The court denied defendants' motion for a new trial.  The subsequently issued amended judgment removed Gevorgian as a judgment debtor from the alter ego ruling and retained the language providing that Gevorgian would be liable as the alter ego if Coachella failed to satisfy the judgment as to damages.

### 2.    Discussion

On appeal, defendants contend that the trial court's ruling imposing the alter ego remedy only if Coachella failed to satisfy the judgment is erroneous as a matter of law.  Defendants argue that the trial court's "conditional" ruling impermissibly imposed "unlimited" alter ego liability on Gevorgian solely based on Coachella's inability to pay damages.

We reject defendants' assertion that the court made a "conditional" alter ego finding.  The court unequivocally found Gevorgian liable as Coachella's alter ego based on the factors described above.  In fashioning an appropriate remedy, the court allowed Gevorgian to avoid being formally named as a judgment debtor, which would have immediately subjected his personal assets to attack for satisfaction of the judgment.  This was not improper.  Courts commonly allow plaintiffs to amend a

25

judgment "to add additional judgment debtors on the grounds that a person or entity is the alter ego of the original judgment debtor." (*NEC Electronics Inc. v. Hurt* (1989) 208 Cal.App.3d 772, 778.) While the court here had already adjudicated the issue of Gevorgian's alter ego liability before judgment, defendants have cited no authority, and we find none, that the sequence of the proceedings prevented the court from ruling as it did here, pursuant to its wide latitude in fashioning an equitable remedy. (*Oceanside Community Assn. v. Oceanside Land Co.* (1983) 147 Cal.App.3d 166, 178 ["Equitable remedies may be molded by the exigencies of each case."]; *Richmond v. Dofflemyer* (1980) 105 Cal.App.3d 745, 766 ["A court of equity has broad powers and comparatively unlimited discretion to do equity without being bound by any strict rules of procedure."].)[7]

---

[7] To the extent the judgment's statement that "Gevorgian, individually, is liable for debts of [Coachella] if the LLC fails to satisfy dollar damages that may be awarded in Phase III (Damages)" created any uncertainty about liability, the record resolves this ambiguity. The record indicates the court did not impose conditional liability on Gevorgian, but merely allowed Gevorgian an opportunity to enable Coachella alone to satisfy the judgment. (See *Rochester Capital Leasing Corp. v. K & L Litho Corp.* (1970) 13 Cal.App.3d 697, 704 [courts construe ambiguity in favor of the judgment and court may refer to record in doing so]; *Tronslin v. City of Sonora* (1956) 144 Cal.App.2d 735, 738 [referring to entire record to interpret judgment].) Indeed, to the extent the trial court erred at all, its mistake arguably may have been in removing Gevorgian as a judgment debtor. However, as plaintiffs did not file a cross-appeal to challenge this aspect of the judgment, we do not address this issue on appeal.

26

### C. The court properly found Gevorgian liable to plaintiff Healy as Coachella's alter ego
#### 1. Background

Healy's initial complaint and FAC did not name Gevorgian as a defendant or include alter ego allegations. But after the trial on liability, and before the trial on the alter ego allegations, Healy moved for leave to file a second amended complaint (SAC) to allege alter ego liability against Gevorgian. Healy's motion was based on Gevorgian's testimony in Phase I that he made distributions from Coachella to his personal bank account. Healy proposed amending her complaint to include two additional paragraphs alleging that Coachella sold the property after the fire, and that Gevorgian "fraudulently transferred" the funds by withdrawing proceeds from the sale even though he knew or should have known about claims arising from the fire.

The trial court granted the motion. In January 2022, Healy filed her SAC asserting causes of action for negligence and negligent hiring, training, and retention. The caption of the SAC identified Coachella, AMG, and Gevorgian as defendants. The body of the SAC alleged Coachella "was owned, controlled, managed[,] and operated by Alexis M. Gevorgian . . . ." The SAC included the two paragraphs Healy proposed in her motion for leave to amend. The proof of service indicates that "[p]ursuant to court order," Healy filed the SAC by electronic service on defense counsel.[8] In December 2022, Coachella answered Healy's SAC. Gevorgian did not file a responsive pleading to Healy's SAC.

---

[8] Plaintiffs Godinez, Lui, and McLean also requested and received leave to amend to file a first amended complaint to add alter ego allegations. As with Healy's SAC, their amended

During the second phase of the proceedings, Healy's counsel questioned Gevorgian about his use of Coachella's office, his bank accounts, the distributions he made from Coachella to his accounts, and Coachella's current operations. Plaintiffs submitted joint pretrial and closing briefs on the issue of alter ego liability.

In the defense's closing brief in Phase II, objections to the court's Phase II ruling, and motion to correct the judgment, defendants argued that Gevorgian was not liable to Healy as an alter ego because she had not named him as a defendant or included alter ego allegations in her operative complaint. Defendants erroneously claimed that Healy had not moved for and obtained leave to amend to add alter ego allegations against Gevorgian. Defendants also filed a motion for a new trial, contending Gevorgian was not a party to Healy's action, had never been served with Healy's SAC, and had never appeared in the Healy action.

The court requested supplemental briefing. Healy's counsel conceded that he did not have Gevorgian personally served with the SAC because he had assumed service on Coachella's lawyer, who also represented Gevorgian, was sufficient, even though defense counsel "never expressly agreed to accept e-service of the SAC on behalf of Gevorgian . . . ."

After resolving several post-judgment motions, the court issued an amended judgment, which continued to find that all

---

pleading named Gevorgian in the caption but did not identify him specifically as a defendant in the body of the complaint. However, the FAC included a paragraph specifically alleging that Gevorgian treated Coachella as his "alter ego." Defendants, including Gevorgian, jointly filed an answer to the FAC.

plaintiffs met their burden with respect to Gevorgian's alter ego liability.

### 2. Discussion

Defendants contend the court had no jurisdiction over Gevorgian because Healy's SAC did not name him as a defendant. We disagree. Healy's motion for leave to amend made clear that she sought to hold Gevorgian liable as Coachella's alter ego. The SAC names Gevorgian in the caption, alleges that he "owned, controlled, managed[,] and operated" Coachella, and that he transferred significant funds from Coachella to his personal bank account after the fire. "[W]hile not a pristine example of pleading" (*Signal Hill Aviation Co. v. Stroppe* (1979) 96 Cal.App.3d 627, 636), the SAC sufficiently apprised Gevorgian that Healy sought to hold him liable as an alter ego in advance of the bench trial.

Defendants also contend that because Gevorgian was never served with, and never appeared in response to, Healy's SAC, the court had no jurisdiction over him and therefore could not find him liable to Healy under the alter ego doctrine. The contention lacks merit.

Service of process asserts jurisdiction over a defendant and provides the defendant with notice of the action and an opportunity to present a defense. (*Crane v. Dolihite* (2021) 70 Cal.App.5th 772, 784.) "Defective service of the petition and notice to appear is not cured by actual notice of the action. 'Nonetheless, defective service is not fatal to personal jurisdiction if the defendant consents to jurisdiction over him or her by making a general appearance in the action.' [Citations.]" (*In re R.L.* (2016) 4 Cal.App.5th 125, 146.)

29

" 'A general appearance by a party is equivalent to personal service of summons on such party.' (Code Civ. Proc., § 410.50, subd. (a).) 'A general appearance operates as a consent to jurisdiction of the person, dispensing with the requirement of service of process, and curing defects in service.' [Citation.] . . . A general appearance can make up for a complete failure to serve a summons. [Citation.] [¶] 'An appearance is general if the party contests the merits of the case or raises other than jurisdictional objections. [Citations.]' [Citation.]" (*Fireman's Fund Ins. Co. v. Sparks Construction, Inc.* (2004) 114 Cal.App.4th 1135, 1145.)

A defendant may appear by answering, demurring, filing motions to strike or transfer, or making a notice of appearance. (Code Civ. Proc., § 1014.) "The statutory list of acts constituting an appearance . . . is not exclusive; 'rather the term may apply to various acts which, under all of the circumstances, are deemed to confer jurisdiction of the person. [Citation.] What is determinative is whether defendant takes a part in the particular action which in some manner recognizes the authority of the court to proceed.' [Citation.] The issue is thus fact-specific . . . ." (*Hamilton v. Asbestos Corp.* (2000) 22 Cal.4th 1127, 1147 (*Hamilton*).)

Here, in January 2018, the parties stipulated to consolidate Healy's action with the other plaintiffs' case "for all purposes." Throughout the second bench trial on alter ego liability, Gevorgian appeared by counsel in the consolidated action without ever indicating he was only specially appearing as to the Healy matter, or that he was appearing as to the Erikson matter only. Gevorgian proceeded to fully participate in the alter ego portion of the trial as a party. Healy's attorneys questioned Gevorgian as

an adverse party under Evidence Code section 776.[9]  He did not object to the questioning on the basis that he was not an adverse party as to Healy because she had not properly served him with the SAC.  His counsel did not assert a lack of personal jurisdiction or due process issues as to Healy's SAC in closing argument.  Instead, counsel addressed the merits of alter ego liability as to all plaintiffs.  This was sufficient to constitute a general appearance.  (*Hamilton, supra*, 22 Cal.4th at p. 1149 [defendant made a general appearance where the trial court ordered actions consolidated for all purposes and defendant "fully participated in [the] consolidated action"].)

---

[9]  This section provides that a party to an action "may be called and examined as if under cross-examination by any adverse party at any time during the presentation of evidence by the party calling the witness."  (Evid. Code, § 776, subd. (a).)

## DISPOSITION

The judgment is affirmed.  Respondents to recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

EGERTON, J.